**UNITED STATES of America, Appellee,**

**v.**

**Ruth JEAN–BAPTISTE, Defendant–Appellant.**

**Docket No. 98–1046.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1998.

Decided Jan. 26, 1999.

Alina P. Marquez, Assistant United States Attorney, Bridgeport, Connecticut (Stephen C. Robinson, United States Attorney for the District of Connecticut, New Haven, Connecticut, on the brief), for Appellee.

Robin C. Smith, Brooklyn, New York, for Defendant–Appellant.

Before: KEARSE and POOLER, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Defendant Ruth Jean–Baptiste appeals from a judgment of the United States District Court for the District of Connecticut, Alan H. Nevas, *Judge*, entered after a jury trial before Adrian G. Duplantier, *Judge* **, convicting Jean–Baptiste of making false statements in a passport application, in violation of 18 U.S.C. § 1542 (1994), and sentencing her principally to three years' probation. On appeal, Jean–Baptiste seeks a new trial, contending principally that she was unfairly prejudiced by the government's presentation of erroneous evidence that, in a prior passport application, Jean–Baptiste had falsely used a social security number that did not belong to her. The government acknowledges that the evidence it introduced was erroneous but contends that the error was

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

** Of the United States District Court for the Eastern District of Louisiana, sitting by designation.

harmless. We are not persuaded that the error was harmless, and we therefore vacate the conviction and remand for a new trial.

## I. BACKGROUND

The present prosecution was commenced after Jean–Baptiste applied in 1996 for a United States passport, stating in her application that she was born in 1952 in St. Croix, Virgin Islands, a territory of the United States ("U.S. Virgin Islands"). As proof of her United States citizenship, Jean–Baptiste furnished the Passport Agency of the United States Department of State ("Passport Office") a document that purported to be her birth certificate from the U.S. Virgin Islands.

A Passport Office specialist compared that certificate against a genuine U.S. Virgin Islands birth certificate on file in the office and judged that Jean–Baptiste's document was not genuine. The specialist referred Jean–Baptiste's application to the agency's fraud coordinator, who agreed that the certificate was not genuine. After further investigation by the Department of State, Jean–Baptiste was indicted for making a false statement in her passport application, in violation of 18 U.S.C. § 1542.

### A. *The Trial*

Section 1542 of Title 18 makes it a felony for a person to, *inter alia,* "willfully and knowingly make[ ] any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws." 18 U.S.C. § 1542. Accordingly, at the two-day trial, the government sought to prove (1) the falsity of Jean–Baptiste's representation in her passport application that she was born in the U.S. Virgin Islands, and (2) Jean–Baptiste's knowledge of the falsity of that representation.

#### 1. *The Government's Case–in–Chief*

In support of the falsity element, the government introduced evidence that the document Jean–Baptiste had presented to the Passport Office was not a genuine birth certificate from the U.S. Virgin Islands. The evidence included expert testimony that the print on Jean–Baptiste's document was more blurred than that on a genuine U.S. Virgin Islands birth certificate; that a genuine certificate bears a "dry" seal, whereas Jean–Baptiste's document bore an ink seal; and that a genuine certificate bears a single imprint of its serial number, whereas the document presented by Jean–Baptiste displayed its number twice. Further, the number shown on Jean–Baptiste's document was anachronistic in that, in sequence, that number would not have been reached until more than a year after the date on which Jean–Baptiste's document purported to have been issued. In addition, the Bureau of Vital Statistics of the U.S. Virgin Islands did not employ a person having the name shown in the purportedly official signature on Jean–Baptiste's document.

The government also presented the testimony of the Director of Health Statistics for the U.S. Virgin Islands Department of Health. The Director testified that births within the territory are routinely recorded, and the records maintained, although if a birth takes place outside of a hospital, the person who delivered the child is responsible for having the birth recorded, and no published law or regulation imposes such an obligation. The Director testified that no official record of Jean–Baptiste's birth could be located in St. Croix or elsewhere in the U.S. Virgin Islands.

As to the contention that Jean–Baptiste knew she was not born in St. Croix, the government in its case-in-chief relied on the permissibility of an inference of such knowledge from the evidence that the birth certificate she had presented was counterfeit.

#### 2. *The Defense Case*

In defense, Jean–Baptiste presented her own testimony and that of her parents, Haitian nationals who, at the time of trial, lived in Massachusetts. She sought to show that she believed she was born in St. Croix, that she was in fact born there, and that she had no knowledge that the document she presented was not a genuine birth certificate.

Jean–Baptiste's mother, Carmen Jean–Baptiste (née Paulection) ("Paulection"), described the circumstances of Jean–Baptiste's birth as follows. Prior to Jean–Baptiste's birth, Paulection traveled several times between Haiti and the U.S. Virgin Islands, where she purchased consumer goods for resale in Haiti. At the start of one such trip in 1952, Paulection was seven months pregnant with Jean–Baptiste. As the boat approached St. Croix, Paulection went into labor and lost consciousness; her next conscious memory was of awakening in a hospital in Haiti, where she remained for some weeks. Paulection testified that her cousin, Simello Louis, who then resided in St. Croix, had accompanied her on that trip from Haiti to St. Croix, and that Louis kept the infant Jean–Baptiste in St. Croix while sending Paulection back to Haiti. Louis subsequently placed Jean–Baptiste in the home of one Pastor Sanchez and his wife, Puerto Rican missionaries then in the U.S. Virgin Islands, who frequently took in infants as foster children. According to Paulection, the Sanchezes later moved their mission to Haiti, bringing the young Jean–Baptiste with them. Paulection first met her daughter when Jean–Baptiste was two years old; Paulection then saw her intermittently as she grew up in the Sanchez home in Haiti. Paulection testified that when Jean–Baptiste was no longer a young child, Paulection explained to her the circumstances of her birth in St. Croix.

Jean–Baptiste's father, Dajusta Jean–Baptiste ("Dajusta"), supported Paulection's testimony. Although not allowed to testify as to where he believed Jean–Baptiste was born, Dajusta testified that Paulection had made several buying trips from Haiti to St. Croix; that on one such trip she was seven months pregnant when she left Haiti, but was no longer pregnant when she returned; that she did not have the baby with her, was unable to recount what had happened in St. Croix, and was very ill; and that Dajusta put her in the hospital. Dajusta also testified that Louis had entrusted the infant Jean–Baptiste to Pastor Sanchez and his wife, who subsequently brought Jean–Baptiste to Haiti and raised her there.

Jean–Baptiste testified that, although raised and educated through high school in Haiti, she had always been told—by her parents and by members of the Sanchez household—that she was born in St. Croix. Accordingly, she believed herself to have been born in St. Croix. Jean–Baptiste testified that Louis had given her the birth-certificate document she presented to the Passport Office, and she did not know it was not authentic. Louis, as well as the Sanchezes, had died some years prior to trial.

### 3. The Government's Rebuttal and Summation

The government sought to rebut Jean–Baptiste's lack-of-knowledge contention through cross-examination of Jean–Baptiste and through the presentation of additional evidence. On cross-examination, for example, the government explored the facts that Jean–Baptiste had stated her birthplace as Haiti (a) in a · 1975 application to attend a bible school · in Puerto Rico, (b) in a subsequent application for an extension of her student visa, and (c) in a 1976 application for a social security number. Jean–Baptiste explained that she had listed Haiti as her birthplace in those documents at the specific direction of Sanchez, but that she believed that her birthplace was in fact St. Croix. She pointed out that her later applications for social security numbers stated St. Croix as her birthplace, as did school records from Haiti.

Jean–Baptiste testified that she had been issued three social security numbers since coming to New York in the mid–1970s, the multiplicity resulting from her social security cards having been stolen or misplaced and new numbers having been assigned to her. She also had applied for and been issued two prior United States passports, including one in 1979. The Assistant United States Attorney ("AUSA"), having elicited that Jean–Baptiste, in her 1979 passport application, had indicated that her social security number was "432–65–7834" (the "–34 number"), asked, "[D]o you realize that that ... number you used, actually belongs to a woman who lives in Helena, Arkansas?" (Trial Transcript ("Tr.") 145–46.) Jean–Baptiste's

response was, "There's no way I could know it, sir." (Tr. 146.)

After the defense rested, the government called as a witness Joseph Blacker, a Social Security Administration ("SSA" or "Administration") supervisor, who testified that the Administration has the ability to do a computer check to determine to whom a given social security number has been issued and that such a search had been made with respect to Jean–Baptiste. The government, however, had at some point transposed the last two digits of the –34 number. Accordingly, the AUSA asked Blacker, "Could you tell the jury, please, to whom that number, 432–65–78*43* was issued?" (Tr. 187 (emphasis added).) Without objection, Blacker testified that the number 432–65–7843 (the "–43 number") had been issued to one "Jeremy Henson" by an SSA office in Safford, Arizona. (*Id.*)

In summation, the AUSA reviewed the evidence indicating that the purported birth certificate used by Jean–Baptiste in support of her 1996 passport application was not genuine; he challenged the credibility of Paulection's account of Jean–Baptiste's birth; and he asked the jury to reject Jean–Baptiste's testimony that she believed she was born in St. Croix and to infer instead that her representation was knowingly and willfully false. The AUSA referred to the several documents that indicated Jean–Baptiste's birthplace as Haiti, and he argued that the jury should infer knowledge and willfulness from her use of a false social security number to secure a passport in 1979:

there's one social security number missing from that stack of applications. And the one that's missing from that stack of applications is the one that begins with the number 432, which you heard her testify was another number she had used. In fact, it was the number she had used to apply for the passport in 1979. . . .

. . . . *Well, you heard testimony about who that passport [sic] number was issued to.* So there's no record here, because . . . she doesn't have a copy of that application because it was filled out by *a guy in Arizona and you heard his name—Helena [sic], Arizona, I think.*

(Tr. 213–14 (emphasis added).) The AUSA asked the jury to infer that Jean–Baptiste knew that she was making a false statement in her 1996 passport application because she had "a record of filling out . . . government forms" in a false or misleading manner. (Tr. 217.)

In his rebuttal summation, the AUSA concluded:

There's no mystery about where she was born if you look at the documents in this case and you listen to the testimony here. She was born in Haiti. She knew she was born in Haiti. And she filled out an application and handed in a birth certificate that suggested that she was born in the Virgin Islands. I suggest to you that the evidence shows, *based on her use of documents in the past, that she knew what she was doing when she did that.* In fact, she had done it before. She knew that the document she was using was false in her attempt to get another passport.

(Tr. 237 (emphasis added).)

### 4. *The Verdict*

The jurors began their deliberations at approximately 4:40 p.m. on the first day of trial and had reached no resolution by 6:20 p.m., when they adjourned for the night. They resumed deliberations at 8:30 a.m. the next day; at 1:45 p.m., they notified the trial judge that they were deadlocked. The judge gave the jurors an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896)), instructing them to resume deliberations. At 4:00 p.m., the jury returned a verdict of guilty.

Jean–Baptiste was sentenced to probation, as indicated above, and she promptly appealed.

### C. *The Posttrial Supplemental Record*

While preparing her appeal, Jean–Baptiste discovered the government's erroneous transposition of the last two digits of the –34 number. When the government was alerted to this error, it sought and received permission from the district court to supplement the record with an affidavit from Blacker, annexing computer printouts with respect to both

the –43 number and the –34 number. Blacker confirmed that, as he had testified at trial, the –43 number had been assigned by the SSA office in Safford, Arizona, to "Jeremy Henson." Blacker's affidavit stated that the –34 number had been assigned by an SSA office in Russelville, Arizona, to a Patrice Murray.

## II. DISCUSSION

On appeal, Jean–Baptiste contends principally that she is entitled to a new trial because she was unfairly prejudiced by the government's introduction of erroneous evidence that she had falsely used the –43 social security number, a number she in fact had never used. She also contends that there were errors in an evidentiary ruling and in the court's instructions to the jury. The government notes that Jean–Baptiste did not object to the –43 number evidence at trial and suggests that its admission was not plain error; the government also argues that the evidence of guilt was strong and hence that the admission of the inapposite –43 number evidence was harmless error. For the reasons that follow, we conclude that the error was plain and not harmless, and we therefore vacate the conviction and remand for a new trial.

### A. *The False Social Security Number Evidence*

 Because Jean–Baptiste did not object to the –43 number evidence at trial, her present challenge to the admission of that evidence is reviewable only if its admission was plain error. *See* Fed.R.Crim.P. 52(a) ("Any error … which does not affect substantial rights shall be disregarded."); Fed. R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *Johnson v. United States,* 520 U.S. 461, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997); *United States v. Rossomando,* 144 F.3d 197, 200 (2d Cir. 1998). In order to establish that an error was "plain" within the meaning of Rule 52, the defendant must show that it (a) was "clear" or "obvious," and (b) "affec[ted] substantial rights," which "in most cases …

means that the error must have been prejudicial." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted). "[A]n error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object" is a plain error within the meaning of the Rule. *United States v. Tillem,* 906 F.2d 814, 825 (2d Cir.1990).

██ Under the Federal Rules of Evidence, a party's other acts, if not otherwise excludable, may be introduced "as proof of … knowledge … or absence of mistake or accident," Fed.R.Evid. 404(b); *see, e.g., United States v. Peterson,* 808 F.2d 969, 974–75 (2d Cir.1987). Thus, if the government had offered evidence that Jean–Baptiste, by using the –34 number, misrepresented her social security number in her 1979 passport application, that evidence would have been admissible as proof from which it could be inferred that a misrepresentation as to birthplace in her 1996 passport application was knowing rather than inadvertent.

The evidence actually introduced by the government, however, showing that a different number that was not in fact used by Jean–Baptiste was not assigned to her, was entirely irrelevant. Yet, in summation, the AUSA suggested, without foundation, that Jean–Baptiste had falsely used the –43 number: "the number she had used to apply for the passport in 1979 …. you heard testimony about who that passport [*sic*] number was issued to," *i.e.,* "a guy in Arizona" (Tr. 214). And the AUSA argued that Jean–Baptiste thus had "a record of filling out … government forms" falsely (Tr. 217), which he urged should lead the jury to infer that Jean–Baptiste's proffer of the bogus birth certificate at issue here was not an innocent mistake.

The government's failure to compare the evidence it would present with the number to which Jean–Baptiste had testified reflected a lack of even ordinary care; and the error in the use of the –43 number evidence should have been obvious to both parties and the court. Had the error been noticed during the trial, the government would have been able to introduce evidence as to the social

security number that Jean–Baptiste actually used. On the actual trial record, however, we think there can be little doubt that the government's arguments that the assignment of the –43 number to Henson showed that Jean–Baptiste had committed fraud in 1979, and thus that she knew the birth certificate she presented in 1996 was fraudulent, implicated Jean–Baptiste's substantial rights and were unfairly prejudicial. We conclude that the government's introduction of the –43 number evidence was plain error.

█ The government argues, however, that because the evidence of Jean–Baptiste's guilt was strong, the error was nonetheless harmless:

> *Blacker's affidavit establishes that neither* the correct social security number nor the transposed social security number was listed to the defendant.... Given that both numbers are listed to persons other than defendant, ... the jury may have properly inferred that the social security number had not been issued to the defendant.

(Government brief on appeal at 14 (emphasis added); *see also id.* at 15 ("the nature of *the evidence remains the same* despite the mistake" (emphasis added)).) This argument does not withstand scrutiny.

█ Blacker's affidavit was first proffered during the pendency of this appeal and, of course, was not before the jury. Thus, his representations as to the assignment of the –34 number were not in evidence. Nor did the government present to the jury any other evidence as to the assignment of the –34 number. And although the AUSA, in cross-examining Jean–Baptiste, asked whether Jean–Baptiste "realize[d] that that ... number you used, actually belongs to a woman who lives in Helena, Arkansas" (Tr. 145–46), an attorney's question—even if its contents are entirely accurate, which these were not—does not constitute evidence, *see, e.g., United States v. Peterson,* 808 F.2d at 975. In sum, the evidence available for consideration by the jury at trial did not include proof that the –34 number was assigned to anyone other than Jean–Baptiste, nor any proof that Jean–Baptiste had ever used a social security number other than her own.

We thus reject the government's contention that harmless error can be premised on the hypothesis that the jury could have found Jean–Baptiste's false use of the –34 number, for "[i]t is transparently obvious that a verdict cannot be based on 'evidence' which the jury does not see or hear," *United States v. Gjurashaj,* 706 F.2d 395, 398 n. 4 (2d Cir. 1983) (internal quotation marks omitted); *cf. Chiarella v. United States,* 445 U.S. 222, 236, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (court of appeals may not affirm a conviction on the basis of a theory that was not presented to the jury); *Dunn v. United States,* 442 U.S. 100, 107, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979) ("appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial"). We must assess harmlessness on the basis of what other evidence the government did introduce at trial, not on the basis of the evidence it could have introduced had its trial preparation and presentation not been so careless.

█ The erroneous admission of evidence is not harmless unless the appellate court can conclude with fair assurance that that evidence did not substantially influence the jury. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Pedroza,* 750 F.2d 187, 197 (2d Cir.1984), *cert. denied,* 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986); *United States v. Check,* 582 F.2d 668, 684 (2d Cir.1978). An error in the admission of evidence may be deemed harmless only if "it is highly probable that the error did not contribute to the verdict." *United States v. Colombo,* 909 F.2d 711, 713 (2d Cir.1990) (internal quotation marks omitted); *see also* Fed.R.Crim.P. 52(a); *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992). In making this determination, we consider principally whether the government's case against the defendant was strong, *see, e.g., United States v. Colombo,* 909 F.2d at 714; *United States v. Gotay,* 844 F.2d 971, 977 (2d Cir.1988); whether the evidence in question "bears on an issue that is plainly critical to the jury's decision," such as the defendant's credibility when her veracity is central to her defense, *Hynes v. Coughlin,* 79 F.3d 285, 291 (2d Cir.1996); *see, e.g., United States v. Colombo,*

909 F.2d at 715; whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury, see, e.g., Hynes v. Coughlin, 79 F.3d at 291; United States v. Colombo, 909 F.2d at 714–15; United States v. Peterson, 808 F.2d at 976; and whether the case was close, see, e.g., Chapman v. California, 386 U.S. 18, 22–23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Colombo, 909 F.2d at 714. The fact that a jury initially was deadlocked and reached a verdict only after receiving an Allen charge may support an inference that the case was close. See United States v. Quiroz, 13 F.3d 505, 513 (2d Cir.1993), reh'g granted in part on other grounds, 22 F.3d 489 (2d Cir.1994) (per curiam).

In the present case, most of these factors favor Jean–Baptiste. For example, the –43 number evidence was introduced for the sole purpose of showing Jean–Baptiste's knowledge of the falsity of her 1996 passport-application representation that she was born in St. Croix. Proof of such knowledge was indispensable, as knowledge and willfulness are elements of the § 1542 offense with which Jean–Baptiste was charged.

Further, although the government's evidence that the birth certificate proffered by Jean–Baptiste was counterfeit was overwhelming, that fact was not necessarily inconsistent with her having been born in St. Croix, and the government's other evidence suggesting that she was not born there and knew she was not born there was not dispositive. For example, although the Director of Health Statistics for the U.S. Virgin Islands Department of Health testified that there was no record of Jean–Baptiste's birth in the U.S. Virgin Islands, the Director also indicated that a birth that took place outside of a hospital need not be reported for recordation. And Paulection's testimony indicated that Jean–Baptiste might well have been born aboard a boat landing in St. Croix.

Moreover, although the government's properly admitted evidence as to Jean–Baptiste's 1996 use of a counterfeit document and as to her prior indications of Haiti as her birthplace was legally sufficient on its face to support a finding of the requisite mental element, the import of that evidence was disputed. Jean–Baptiste testified that Sanchez had instructed her to list Haiti as her birthplace, and she had simply done as he instructed while believing she was born in St. Croix. Further, the jury could have credited Jean–Baptiste's testimony as to how she obtained the counterfeit birth certificate. She testified that when she first needed birth documentation in the 1970s, she had consulted her mother, who told her to contact Louis. It is certainly logical for a person needing birth documentation to consult her mother; and it was plausible that Paulection should refer Jean–Baptiste to Louis who, according to Paulection's version of the 1952 events, had initially taken charge of Jean–Baptiste upon her birth. There was no evidence to show that Jean–Baptiste had any familiarity with genuine U.S. Virgin Islands birth certificates such that she should have been aware of the discrepancies between her document and a genuine birth certificate and thereby have been alerted that the document she received from Louis was counterfeit.

In its summation, the government was not content to rely on its properly admitted evidence, from which Jean–Baptiste's knowledge of a false statement in her 1996 passport application could legitimately have been inferred. Rather, it mentioned the inapposite –43 number evidence several times. It attributed use of that number to Jean–Baptiste (see Tr. 214 ("the number she had used to apply for the passport in 1979 .... was issued to .... a guy in Arizona")), and stated that Jean–Baptiste thus had "a record of filling out ... government forms" falsely (Tr. 217). The AUSA's parting argument to the jury, made in his rebuttal summation, was that the jury should infer, "based on her use of documents in the past, that she knew what she was doing when she" used the counterfeit birth certificate in 1996. (Tr. 237.)

Finally, we think it plain that the jury did not find the government's case to be overwhelming. The factual issues were not complex, and the entire presentation of evidence at trial consumed little more than half a day. The jury's deliberations required nearly twice that amount of time. And even with the –43 number evidence before it, the jury reported to the court that it could not agree

on a verdict. The jury reached a verdict only after receiving an *Allen* charge. Had the –43 number evidence been excluded from the record that was before the jury, the jury might well have declined to convict.

In sum, the government's properly admitted evidence, though sufficient, was not overwhelming; the government did not offer any evidence that the –34 number used by Jean–Baptiste had been assigned to someone else, or that Jean–Baptiste had ever used a social security number that was not assigned to her; the –43 number evidence, falsely implying that Jean–Baptiste had fraudulently misused that number, was directly linked to the mens rea element the government was required to prove; the AUSA, in summation, repeatedly referred to the –43 number evidence as proof of that element; and even with that inapposite –43 number evidence before it, the jury had difficulty reaching a verdict. We conclude that, in light of the trial evidence, the government's error was not harmless. We accordingly vacate the judgment and remand for a new trial.

### B. *Other Contentions*

Jean–Baptiste also contends that she is entitled to a new trial because there were errors in one of the trial court's evidentiary rulings and in one aspect of its instructions to the jury. Although these issues are, for purposes of this appeal, mooted by our decision above, we address them briefly in light of the likelihood that they would recur at a new trial.

 Jean–Baptiste contends that the trial court erred in excluding testimony by her father, Dajusta, as to his belief that Jean–Baptiste was born in St. Croix. That testimony would have been relevant both to the alleged falsity of Jean–Baptiste's passport-application statement that she was born in St. Croix, and to Jean–Baptiste's knowledge as to truth or falsity. The government argues that that testimony was properly excluded because it was not within Fed.R.Evid. 803(19) and because it was cumulative.

Rule 803(19) provides that, even if the declarant is available, the following is not excluded by the hearsay rule:

(19) **Reputation concerning personal or family history.** Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

Fed.R.Evid. 803(19). The government contends that Dajusta's proposed testimony was excludable under this Rule because the birth to which he was to testify was that of Jean–Baptiste rather than his own. We disagree. The Rule itself contains no such limitation and plainly contemplates that members of a family may testify with regard to the common understanding as to the birth of another family member. *See* Fed.R.Evid. 803 Advisory Committee Note (1972); 5 *Weinstein's Federal Evidence* § 803.24 (1998).

However, the trial court has discretion to exclude even otherwise admissible evidence if it finds that its probative value is substantially outweighed "by considerations of . . . needless presentation of cumulative evidence." Fed.R.Evid. 403. The record does not reveal the ground on which the trial court excluded this evidence at the first trial. The trial judge is free to revisit the issue upon retrial.

 Finally, Jean–Baptiste contends that because § 1542 provides that it is unlawful for a person to make willful and knowing false statements in a passport application "with intent to induce or secure the issuance of a passport . . . *either for his own use or the use of another*," 18 U.S.C. § 1542 (emphasis added), no violation is established unless there is proof that the defendant intended to make use of the passport. Here Jean–Baptiste presented evidence that she had gone to the Passport Office to obtain a passport for her daughter, who was to travel abroad with a church band, and that the simultaneous renewal of Jean–Baptiste's own passport was merely a matter of convenience and that she had no plans to use it. She contends that the jury should have been instructed that it must acquit if the government failed to prove that when she applied

for the 1996 passport she had the intent to use it. We disagree.

The first paragraph of the statute, as set out in Part I.A. above, makes it unlawful for a person to

> willfully and knowingly make[ ] any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws.

18 U.S.C. § 1542. The second paragraph makes it unlawful to

> willfully and knowingly use[ ] or attempt[ ] to use, or furnish[ ] to another for use any passport the issue of which was secured in any way by reason of any false statement.

*Id.* This section, which is virtually identical to a predecessor statute construed in *Browder v. United States,* 312 U.S. 335, 335–36 n. 1, 61 S.Ct. 599, 85 L.Ed. 862 (1941), "is aimed at the protection of the integrity of United States passports," *id.* at 341, 61 S.Ct. 599.

In *Browder,* in considering a conviction under the "use" prong of the statute, the Supreme Court observed that

> [t]he balanced form of [the section] ... shows that the Congress viewed with concern and punished with equal severity the securing of passports by false statements and their use. The crimes denounced are not the securing or the use but either of such actions [as] made criminal only by the false statements in the procurement of the passport.

*Id.* at 337, 61 S.Ct. 599. Thus, the statute "penalizes both procuring the passport by a false statement and its use when so procured"; but "the basic wrong under this passport statute ... is the securing of a passport by a false statement...." *Id.* at 341, 342, 61 S.Ct. 599.

Circuit courts, construing the "securing" prong of § 1542 in light of *Browder,* have concluded that the offense of making a false statement in a passport application may be proven without regard to whether the defendant had any intent to make fraudulent use of the passport. For example, the Eleventh Circuit in *United States v. O'Bryant,* 775 F.2d 1528 (11th Cir.1985), noted that § 1542

> proscribes "willfully and knowingly" making a false statement in a passport application. The crime is complete when one makes a statement one knows is untrue to procure a passport.... Good or bad motives are irrelevant.

*Id.* at 1535. *See also Liss v. United States,* 915 F.2d 287, 293 (7th Cir.1990).

We too decline to add an element to the § 1542 offense that is not reflected in the language of the statute. The section contains no language stating that the person making the false statement "with intent to induce or secure the issuance of a passport," 18 U.S.C. § 1542, must simultaneously have the intent to use the passport. We read the words "for his own use or the use of another," on which Jean–Baptiste focuses, as reflecting Congress's intent simply to encompass false statements in any passport application, regardless of the name in which the passport is to be issued and regardless of the identity of the passport's prospective user. It would hardly serve Congress's goal of protecting the integrity of United States passports if, as Jean–Baptiste urges, the section were read to allow a person, with impunity, to commit a knowing and willful fraud in her passport application, in order to have the passport on hand in case an occasion arose for its use. We reject Jean–Baptiste's contention that the failure to instruct the jury in accordance with her theory was error.

### CONCLUSION

We have considered all of the parties' arguments on this appeal and have found them to have merit only as indicated above. The judgment of conviction is vacated, and the matter is remanded to the district court for further proceedings not inconsistent with this opinion.