Alan MEDINA, Petitioner–Appellant,

v.

Thomas HORNUNG, Warden, of Donovan State Prison, Respondent–Appellee.

No. 02–56484.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 2003.

Filed June 23, 2004.

---

Charles M. Sevilla, Cleary & Sevilla, LLP, San Diego, CA, for the petitioner-appellant.

Steven T. Oetting, Deputy Attorney General, San Diego, CA, for the respondent-appellee.

Before NOONAN, TALLMAN, and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge:

Alex Medina (Medina) appeals the district court's denial of his habeas petition. Medina was convicted by a jury in California state court of assault with a deadly weapon (Cal.Penal Code § 245(a)(1)) and felony hit-and-run (Cal. Vehicle Code § 20001).

Medina's habeas petition challenges certain allegedly prejudicial *ex parte* statements made by the trial judge to the jury in violation of his constitutional rights to counsel and to be present during trial.[1] The California Court of Appeal found constitutional error but denied relief on harmless error grounds. We have jurisdiction pursuant to 28 U.S.C. § 2253. Because the state court's denial of Medina's appeal was neither contrary to, nor an unreasonable application of, clearly established federal law, we affirm the district court's denial of Medina's habeas petition. Further, we take this opportunity to explain that, for the purpose of the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), if a state court disposes of a constitutional error as harmless using an appropriate standard of review, federal courts must examine that disposition for objective unreasonableness without reference to the harmless error test set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Only if the state court's harmless error analysis amounts to an unreasonable application of clearly established federal law do we apply the harmless error standard set forth in *Brecht* to see whether a habeas petitioner may still be denied relief.

## I. BACKGROUND

### A. Factual Background

#### 1. The Initial Meeting

This case deals with an instance of "road rage" in San Diego, California, at approximately ten o'clock in the evening. Medina was driving south on Fourth Avenue when he stopped at an intersection. To Medina's immediate left were pedicab[2] drivers Charles Ennion and Jimmy Hennessey, and their passengers.

After looking at Medina, Ennion either said, "Smile amigo," or "Hey amigo, want to race?" Taking offense, Medina replied, "You don't know me to be calling me amigo." Though the parties disagree as to the order of these events, the record shows that Medina shone a spotlight onto Ennion, who moved his pedicab to block Medina's movement. The pedicab passengers exited the cabs shortly thereafter.

At this point, the witnesses' recollections diverge.

#### 2. Appellant's Recollection of Events

Medina drove around Ennion's pedicab, turned west, and stopped about four car lengths away. The pedicab drivers followed Medina, exited their cabs, and began arguing with Medina. Ultimately, the parties broke away, with Medina continuing westward.

While driving, Medina decided to make a U-turn, because he did not know whether the street he was on continued. Still "energized" after the confrontation with Ennion, Medina lost control of his car and

---

1. We have addressed Medina's other arguments in a concurrently filed memorandum disposition.

2. A "pedicab" is a bicycle with a passenger compartment attached to the rear.

ended up in the center divide facing northeast.

Medina paused briefly before moving to his right (eastward) in an arcing motion to return to the correct lane of traffic. Medina estimated that he was driving ten to fifteen miles per hour. At this point, Ennion started pedaling in Medina's direction at "full tilt," and made a sudden U-turn toward the left, causing Medina to unintentionally collide with Ennion's pedicab.

Medina did not remember the pedicab going under his car. He reversed direction and started to drive away after Ennion began hitting the back of Medina's car. Fearing for his safety, Medina fled the area.

### 3. The Pedicab Drivers' Version of Events

After his passengers disembarked, Ennion parked his bicycle near the intersection, followed Medina on foot, and the two began arguing. At some point, Ennion decided that he was looking foolish and walked back to his pedicab. Once on his pedicab, Ennion began moving away when he heard yelling and screeching tires, and saw Medina heading toward him head-on. Medina's car hit the back wheel of Ennion's pedicab and Ennion went under the car. Medina's car traveled through two lanes of opposing traffic to strike Ennion.

Hennessey observed Medina make a U-turn, stop, and continue taunting Ennion. After Ennion got onto his bicycle and started moving, Medina "floored it," striking Ennion. Medina continued pushing forward until Hennessy threw a hubcab at Medina, who then reversed direction and drove away.

### 4. The Passengers' Observations

Two of Ennion's passengers saw Medina cut across several lanes of traffic before colliding with Ennion. Another passenger saw Medina make a U-turn after passing Ennion. As Ennion began pedaling, the passenger observed Medina drive quickly toward Ennion. She also saw Medina's car drag Ennion's pedicab a short distance.

### 5. Other Witnesses' Viewpoints

A bystander saw Medina drive down the street and then make an abrupt U-turn. Medina idled for about three minutes with his wheels turned "hard left" toward Ennion. After Ennion's pedicab began moving, Medina accelerated and hit the front of Ennion's pedicab. The bystander thought the collision looked intentional.

A driver in the vicinity recalled seeing Medina's car, at a forty-five degree angle from the proper lane of traffic, striking a pedicab. The driver saw Medina's car back up after the crash and strike the pedicab a second time before leaving. The driver recorded Medina's license plate number and provided it to the police.

A resident of a second-floor apartment near the site of the incident heard yelling and tires screeching outside his apartment. When he looked out, he observed Medina's car on top of a pedicab. Medina's wheels were still spinning forward.

### 6. Testimony of Prior Assault Victim

The trial court admitted the testimony of a prior assault victim for the limited purpose of establishing Medina's identity, and that the collision in the present case was not due to a mistake or accident. The prior victim testified that, two years earlier, she stopped her car on the side of the road to pick up a friend. Medina, who was behind the victim, became angry at the delay, got out and swung a shovel at the man she had stopped to pick up, and rammed the victim's car.

### 7. Trial Court's Response to the Jury's Request for Clarification

While deliberating, the jury sent the trial judge a note that read:

This jury needs clarification of the concept of "proof of intent" and "reasonable doubt." Also, what is "proof?" And how should we take sworn testimony?

The attorneys agreed that the judge should answer the note by re-reading the relevant jury instructions to the jury. The judge conducted the agreed-upon *ex parte* readback session, but prefaced that session with the following statement that was not agreed to by counsel:

I'm going to give you the reference in the jury instructions and tell you to use your common sense and the common meaning of words. This is not rocket science by any stretch of the imagination.

The judge then provided citations to specific jury instructions.

### B. Appellate History

Medina filed a direct appeal and a habeas petition in the California Court of Appeal. The Court of Appeal decided that the *ex parte* statement resulted in constitutional error, but denied relief on the ground that the error was "harmless beyond a reasonable doubt." The California Supreme Court summarily denied relief.

Medina then filed his federal habeas petition. The magistrate judge recommended denying the petition and the district court agreed. Medina timely appealed.

## II. STANDARD OF REVIEW

### A. AEDPA Standard of Review

■ We review *de novo* the district court's denial of Medina's habeas petition. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.2003). Because Medina filed his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his appeal is governed under the rules of that Act. *Id.* Under AEDPA, we may grant the petition only if the state court's denial of relief:

(1) resulted in a decision that was either "contrary to," or was an "unreasonable application" of, "clearly established federal law" as set forth by the United States Supreme Court; or

(2) was based on an "unreasonable determination" of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Because the California Supreme Court summarily dismissed Medina's habeas petition, we "look through" that dismissal and review the "last reasoned" state court decision. *Bailey v. Rae*, 339 F.3d 1107, 1112 (9th Cir.2003) (citation omitted). In the instant case, that decision is the one penned by the Court of Appeal.

■ The "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) provide independent avenues of relief. *Clark*, 331 F.3d at 1067. The "contrary to" clause of § 2254(d)(1) provides relief if the state court "fail[ed] to apply the correct controlling authority, or if it applie[d] the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reache[d] a different result." *Id.* (citation omitted). Under the "unreasonable application" clause of § 2254(d)(1), relief may be granted if the state court "identifie[d] the correct governing legal principle but unreasonably applie[d] that principle to the facts ..." *Id.* (citation and alteration omitted). Extraordinarily deferential to the state courts, the "unreasonable application" clause does not trigger habeas relief unless the state court's analysis was "objectively unreasonable." *See id.* at 1067–68. This requires a showing of error greater than clear error. *See id.* at 1068.

■ Finally, even if the state court's decision was contrary to, or an unreason-

able application of, clearly established federal law, habeas relief may still be denied absent a showing of prejudice. *See Early v. Packer*, 537 U.S. 3, 10–11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). There are two forms of prejudice. Only a small group of "structural errors" are deemed so harmful that they warrant per se relief. *Dyer v. Calderon*, 151 F.3d 970, 973 n. 2 (9th Cir.1998) (citing to *Arizona v. Fulminante*, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The overwhelming majority of trial errors are non-structural and do not trigger habeas relief unless the error resulted in "substantial and injurious effect or influence in determining the jury's verdict," or unless the judge "is in grave doubt" about the harmlessness of the error. *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (citation omitted); *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). The relevant inquiry is whether the tainted evidence actually harmed the appellant. *See Mancuso v. Olivarez*, 292 F.3d 939, 950 (9th Cir.2002) (internal citation omitted).

## B. AEDPA Standard of Review Applied to a State Court's Determination of Harmless Error

The Court of Appeal ruled that the trial judge's *ex parte* remarks to the jury resulted in constitutional error, but determined that the error was harmless. Because special considerations regarding the application of the *Brecht* analysis arise when the issue under federal habeas review is a state court's determination of harmless error, we take this opportunity to clarify *Brecht's* application in this context.

A state court may dispose of most constitutional errors by finding them harmless under the Supreme Court's decision in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which requires the error to be harmless beyond a reasonable doubt, or harmless under an equivalent state law standard. *See Early*, 537 U.S. at 8, 123 S.Ct. 362. However, as discussed above, federal habeas courts determine harmless error under a different standard—whether the error resulted in substantial or injurious harm. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710.

The existence of these disparate harmless error standards does not affect the application of the "contrary to" clause of § 2254(d)(1). However, their presence fosters confusion regarding how federal courts should apply *Brecht* in determining the reasonableness of the state court's harmless error analysis under § 2254(d)(1)'s "unreasonable application" clause. At first glance, it appears that we are layering one reasonableness analysis upon another. However, closer study reveals the following two approaches to reviewing the state's harmless error analysis under the unreasonable application clause:

(1) Federal courts may include the *Brecht* analysis as part of the "unreasonable application" determination. Under this analytical model, the reasonableness of the state court's *Chapman* application is determined by conducting a *Brecht* test. If the prejudice in the case warrants relief under *Brecht*, the state court's *Chapman* analysis necessarily violated the "unreasonable application" clause of § 2254(d)(1).

(2) Alternatively, federal courts may apply the *Brecht* analysis as a separate legal construct. Under this model, federal courts first determine whether the state court's harmless error analysis was objectively unreasonable under the "unreasonable application" clause of § 2254(d)(1). Only if a predicate finding of unreasonableness is made would the federal court apply *Brecht* to determine

whether the habeas petitioner should nevertheless be denied relief.

Our sister circuits have split on the issue.[3] However, we read the United States Supreme Court's recent decision in *Mitchell v. Esparza*, 540 U.S. 12, ――――――, 124 S.Ct. 7, 11–12, 157 L.Ed.2d 263 (2003) (per curiam), as endorsing the second approach. In *Esparza*, the Supreme Court held that "habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Id.* at 12 (citations omitted). In upholding the state court's harmless error analysis, the Supreme Court did not refer to or apply *Brecht*. The implication is that federal courts should not initially use *Brecht* in determining whether the state court's harmless error analysis was consistent with the "unreasonable application" clause of § 2254(d)(1).

The Supreme Court's decision in *Penry v. Johnson*, 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), in which the Court applied a *Brecht* analysis to an AEDPA case, does not compel a different result. The *Penry* Court was not reviewing the reasonableness of a state court's harmless error analysis; rather, the Court applied a harmless error analysis in the first instance. *See id.; cf. Penry v. State*, 903 S.W.2d 715, 759–60 (Tex.Crim.App. 1995) (reflecting no harmless error analysis by the state court). Accordingly, if a federal court applies a harmless error analysis in the first instance, the *Brecht* standard governs. *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir.2000) (applying *Brecht* when the state court decided the case under the wrong harmless error standard or failed to apply a harmless error analysis entirely). Because the state court in this case conducted a harmless error analysis, we are guided by the approach endorsed by the Supreme Court in *Esparza*, first deciding whether the state court's harmless error analysis is objectively unreasonable and, if so, applying *Brecht*.

■ Therefore, pursuant to *Mitchell v. Esparza*, 540 U.S. at ――――, 124 S.Ct. at 12, we hold that if a state court disposes of a constitutional error as harmless under an appropriate standard of review, federal courts must, for the purpose of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. Only if there is a predicate finding that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, should federal courts engage in a *Brecht* analysis.

We turn now to the merits of Medina's case.

## III. DISCUSSION

As described earlier, after the jury asked for clarification regarding the concepts of "proof," "reasonable doubt," and how to "take" sworn testimony, the parties agreed that the judge would re-read the relevant instructions to the jury outside the presence of the attorneys. Prior to the readback, the judge made the following prefatory statement:

I'm going to give you the reference in the jury instructions and tell you to use

---

**3.** The Sixth Circuit took the lead by following the first approach in *Nevers v. Killinger*, 169 F.3d 352, 371–72 (6th Cir.1999); *see also Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir.2003). By contrast, the Tenth Circuit has elected to pursue the second approach. *See Cargle v. Mullin*, 317 F.3d 1196, 1220, 1224 (10th Cir. 2003); *see also Saiz v. Burnett*, 296 F.3d 1008, 1012–13 (10th Cir.2002) (holding that if the state court correctly applied *Chapman*, federal courts do not apply *Brecht* unless the state court's *Chapman* analysis violated AEDPA). Other circuits have reserved judgment. *See, e.g., Fuller v. Gorczyk*, 273 F.3d 212, 220–21 (2d Cir.2001); *see also Anderson v. Cowan*, 227 F.3d 893, 898–99 n. 3. (7th Cir.2000).

your common sense and the common meaning of words. This is not rocket science by any stretch of the imagination.

The Court of Appeal determined that the trial court committed constitutional error by making those remarks, but disposed of that error on harmless error grounds.

 Improper *ex parte* remarks made by the judge to the jury are subject to harmless error analysis. *Rushen v. Spain*, 464 U.S. 114, 118–20, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). The California Court of Appeal's harmless error determination in this case was not "contrary to" established federal law. Although the Court of Appeal did not identify *Chapman* as the guiding point of its harmless error analysis, it applied a state-law "harmless beyond a reasonable doubt" standard that comports with federal law. *See Chapman*, 386 U.S. at 24, 87 S.Ct. 824; *see also Early*, 537 U.S. at 8, 123 S.Ct. 362 (noting that a state court need not cite Supreme Court cases, so long as its analysis is not contrary to governing caselaw). Neither did the decision conflict with any materially indistinguishable Supreme Court cases.

The Court of Appeal's decision also did not amount to an "unreasonable application" of clearly established federal law. Medina argues that he was prejudiced because the trial judge's impromptu instruction to the jury to "use your common sense and the common meaning of the words" provided the jurors with a "roving commission" to ignore the legal definitions contained in the jury instructions, and instead allowed jurors to interpret legal phrases *ad hoc*.

In rejecting Medina's claim, the Court of Appeal took note of the fact that, after making his improper remarks, the judge expressly charged the jury with re-reading the relevant jury instructions. This command significantly reduced the likelihood that the jury applied a "roving commis-

sion" to ignore the governing legal definitions. *See Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (holding that the Constitution requires no more when the trial court rereads the applicable instruction).

Medina also argued that the trial judge's "rocket science" remark prejudiced him by marginalizing the jury. The Court of Appeal disagreed. After considering at length how the term "rocket science" is used in everyday life, the court concluded that the term did not denigrate the jury and that the phrase, being neutral as to Medina, was non-prejudicial.

While reasonable minds might disagree with the notion that the trial court's terminology was non-derogatory, that disagreement hardly rises to the level of objective unreasonableness required by AEDPA. Moreover, even if the jury were insulted, we fully agree with the state court that the phrase was neutral as to Medina and that he suffered no prejudice thereby. It is just as likely that any insult benefited Medina as it is that it worked to his detriment.

Because the Court of Appeal's approach to resolving Medina's claim was consistent with the Supreme Court's holding in *Weeks*, its application of the harmless error rule was not an objectively unreasonable application of federal law.

## IV. CONCLUSION

State courts may dispose of most constitutional errors by applying the Supreme Court's *Chapman* test or an equivalent standard. If the state court applied the correct standard of review, and if that disposition does not conflict with any "materially indistinguishable" Supreme Court cases, relief may not be granted under AEDPA § 2254(d)(1)'s "contrary to" clause.

Federal courts reviewing a state court's harmless error analysis under § 2254(d)(1)'s "unreasonable application" clause must first determine the objective reasonableness of the state court's harmless error analysis. If the state court's decision does not rise to the level of objective unreasonableness, our inquiry ends. However, if the state court's analysis were objectively unreasonable, thereby reflecting an unreasonable application of clearly established federal law, we apply the *Brecht* test to determine whether the petitioner is entitled to habeas relief.

In this case, the California Court of Appeal's harmless error analysis was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, we AFFIRM the district court's denial of habeas relief.

**AFFIRMED.**