Guy ZAPPULLA, Petitioner–Appellant,

v.

**People of the State of NEW YORK, Respondent–Appellee.**

Docket No. 03–2793.

United States Court of Appeals, Second Circuit.

Argued: July 15, 2004.

Decided: Nov. 17, 2004.

Amended: Dec. 7, 2004.

---

Brian Sheppard, New Hyde Park, N.Y. for Petitioner–Appellant.

Camille O'Hara Gillespie, Assistant District Attorney, Kings County (Charles J. Hynes, District Attorney, Victor Barall, and Leonard Joblove, Assistant District Attorneys, on the brief), Brooklyn, NY, for Respondent–Appellee.

Before: POOLER, SACK, and RAGGI, Circuit Judges.

Judge RAGGI dissents in a separate opinion.

POOLER, Circuit Judge.

Petitioner–Appellant Guy Zappulla appeals from a judgment of the United States District Court for the Eastern District of New York (Weinstein, *J.*), entered October 10, 2003, denying his petition for a writ of habeas corpus. His petition sought to challenge a judgment of the New York Supreme Court, Kings County (Kreindler, *J.*), rendered on March 30, 1999, convicting him after a jury trial of murder in the second degree. The New York State Appellate Division, Second Department ("Appellate Division"), affirmed Zappulla's murder conviction while concluding that the wrongful admission of Zappulla's confession, taken in violation of his *Miranda* rights, was harmless error. We find that the Appellate Division applied the harmless error review in an "objectively unreasonable" manner, and that the erroneous admission of his confession requires us to vacate his conviction.

## BACKGROUND

The facts of the case are derived largely from the factual account in the district court decision, which in turn was drawn

from the Appellate Division's decision affirming Zappulla's conviction. *Zappulla v. New York*, 296 F.Supp.2d 309, 311 (E.D.N.Y.2003) (*"Zappulla"*); *People v. Zappulla*, 282 A.D.2d 696, 724 N.Y.S.2d 433 (2d Dep't 2001) (*"People"*). On March 17, 1998, at approximately 12:30 a.m., Zappulla was arrested at the Golden Gate Inn in Brooklyn, New York, based on a police report that he had stolen his girlfriend's fur coat and jewelry. *Zappulla*, 296 F.Supp.2d at 311. At the time of his arrest, the arresting officers read him his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then attempted to question him about the theft. Zappulla refused to talk about the theft but spoke about other matters. During this time, the police found a motel room key on Zappulla's person and went to the corresponding room. Inside the room, the police officers discovered the fur coat that was reported stolen and the dead body of a prostitute, Jennifer Scarpati, a.k.a. Jennifer Imparato ("Jennifer"), hidden under one of the motel beds. In the meantime, Zappulla momentarily escaped from police custody and, while attempting to flee, was hit by a car and taken to the hospital. Upon his return to police custody the following day, Zappulla was again questioned, although this time he was not warned about his *Miranda* rights and was questioned about the more serious crime of murder. Zappulla initially stated that he wanted a lawyer, and the officers responded, "If you want a lawyer, we can't speak to you any further." *Zappulla*, 296 F.Supp.2d at 312. Zappulla then confessed to the police about the murder and signed a statement memorializing his confession. In this confession, Zappulla admitted that an individual named "Teamo or Aaron" (a.k.a. Aaron Cohen) rented a motel room for him and he stayed there for three days "getting high." Jennifer, a close friend of Cohen's, joined Zappulla at the motel room and smoked crack with him and Cohen. Zappulla's confession indicated that he later became angry when he realized that Jennifer had stolen jewelry from him to purchase more crack. According to the confession, he then got into an argument with Jennifer about the jewelry, choked her, and left the room.

The trial court rejected Zappulla's motion to suppress the confession and permitted the prosecutor to use the confession at trial. Zappulla's first trial for Jennifer's murder resulted in a mistrial after the jury deliberated for three days without being able to reach a verdict, despite the reading of an *Allen* charge. At the second trial, the prosecutor relied more heavily on Zappulla's confession, mentioning it as the first piece of evidence in the prosecution's case. At summation, the prosecutor again discussed the circumstances and details of Zappulla's confession. The prosecutor emphasized how the confession was credible and tied in with other evidence in the case and how it provided vital evidence of motive. On March 10, 1999, the court delivered a charge to the jury on intentional murder, and the jury retired to deliberate at approximately 9:30 a.m. The jury requested and received numerous items, including Zappulla's signed confession. At 5:15 p.m., the jury returned with a verdict, finding Zappulla guilty of intentional murder. On March 30, 1999, the court sentenced Zappulla to a prison term of 25 years to life.

The Appellate Division affirmed Zappulla's conviction on direct appeal even though it found that the trial court erred in admitting Zappulla's confession. *People*, 282 A.D.2d at 697, 724 N.Y.S.2d 433. The court found that the confession was defective because 24 hours had elapsed between the initial questioning of Zappulla, where *Miranda* warnings were given, and the subsequent interrogation, where the

officers questioned him without *Miranda* warnings about a different crime and custody was not continuous. The court, however, found that failure to suppress the confession was harmless in light of the "overwhelming evidence of his guilt." *Id.* at 698. Specifically, the court found:

A witness testified that the defendant was with [Jennifer] in Room 234 at the Golden Gate Inn in the days and hours immediately before the crime. Surveillance videotape from the motel showed the defendant leaving and then reentering the motel shortly before the police arrived and arrested him on March 17, 1998. Expert testimony indicated that [Jennifer's] death occurred sometime between the evening of March 16 and the early morning of March 17. The key to Room 234, the room where [Jennifer's] body was found, was recovered from the defendant's person after his arrest. D.N.A. testing of blood found on the defendant's clothing revealed that the blood was [Jennifer's]. In addition, the defendant admitted to an inmate, who was incarcerated with the defendant pending trial, that when he choked [Jennifer] "blood came out." In light of this overwhelming evidence, there is no reasonable possibility that the error of admitting the defendant's statement into evidence might have contributed to his conviction.

*Id.* A judge of the New York Court of Appeals denied Zappulla's application for leave to appeal. *People v. Zappulla,* 96 N.Y.2d 909, 730 N.Y.S.2d 808, 756 N.E.2d 96 (2001). No state collateral proceedings were initiated.

Having sufficiently exhausted his avenues for relief under state law, in June 2002, Zappulla, *pro se,* filed a habeas petition in the district court for the Eastern District of New York. On September 30, 2003, the district court denied Zappulla's petition by holding that, although the confession was erroneously admitted, admission of the confession was harmless in light of the overwhelming evidence of guilt. *Zappulla,* 296 F.Supp.2d at 319. In so holding, the district court specifically adopted the reasoning of the Appellate Division, set forth above, with little additional analysis. *Id.* The district court, however, granted Zappulla a certificate of appealability on the question of whether the erroneous admission of the confession was harmless. *Id.* at 320. On December 22, 2003, this Court appointed counsel to represent Zappulla in this appeal.

### DISCUSSION

"This Court reviews *de novo* the District Court's denial of the petition [for habeas corpus]." *Francolino v. Kuhlman,* 365 F.3d 137, 140 (2d Cir.2004).

### I. Harmless Error Standard

Where a confession has been erroneously admitted in violation of the defendant's *Miranda* rights, this constitutional error is subject to a harmless error analysis. *See Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Brown v. Keane,* 355 F.3d 82, 91 (2d Cir.2004) ("A habeas petitioner is entitled to relief only if the constitutional error at trial was not harmless.").

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, the Supreme Court held in *Brecht v. Abrahamson* that, on collateral review of a state conviction, an error is harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted). In *Chapman v. California,* the Court held that on direct review of a criminal convic-

tion, an error may be overlooked only if it is "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under AEDPA, a federal habeas court may grant the writ if the state court's decision constitutes an "unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We have previously noted that it remains "an open question in this circuit whether, following the passage of AEDPA, the applicable test on habeas review of a state conviction remains the one set forth in *Brecht*, or instead should be a determination [of] whether the state court's decision was contrary to, or involved an unreasonable application of *Chapman*." *Brown*, 355 F.3d at 91 (quoting *Noble v. Kelly*, 246 F.3d 93, 101 n. 5 (2d Cir.2001)) (internal quotation marks omitted).

Recently, the Supreme Court arguably resolved this uncertainty. *Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam). In *Mitchell*, the Sixth Circuit considered whether the death sentence was properly imposed where the State failed to charge in the indictment the aggravating circumstance upon which the death sentence was predicated. *Esparza v. Mitchell*, 310 F.3d 414, 416 (6th Cir.2002). The trial court likewise failed to instruct the jury on the aggravating circumstance and the jury did not return a verdict that found one or more of the aggravating circumstances. *Id.* at 416–17. The Sixth Circuit held that it was error to impose the death penalty under such circumstances and that such an error was categorically immune from harmless error review. *Id.* at 421–22. In reversing the Sixth Circuit, the Supreme

Court first found that the trial court's errors were not immune from harmless error review. *Mitchell*, 540 U.S. at 16–17, 124 S.Ct. 7. It then held that the Ohio Court of Appeals' conclusion, that failure to comply with the state death penalty statute was harmless error, was not objectively unreasonable. *Id.* at 18, 124 S.Ct. 7. The Court stated that "habeas relief is appropriate only if the [state] Court of Appeals applied harmless error review in an 'objectively unreasonable' manner." *Id.* However, the Court also held that a constitutional error can only be found harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 17–18, 124 S.Ct. 7. (internal quotation marks omitted).

■ This case requires us to address what standard governs our review of a district court's determination that a constitutional error was harmless following the passage of AEDPA.[1] We follow, as we must, the Supreme Court's reasoning in *Mitchell* to hold that, in reviewing a state court's harmless error determination, we only may reverse determinations that are objectively unreasonable. *See id.* The pertinent state court determination is whether the People proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks omitted).

II. *The Appellate Division's Determination That Admission Of Zappulla's Confession Was Harmless Error Was An Objectively Unreasonable Application of Supreme Court Precedent*

In *Arizona v. Fulminante*, the Supreme Court considered numerous factors in

---

1. As acknowledged in *Brown*, although numerous cases in this circuit have previously observed that the standard for reviewing a harmless error determination remains uncer-
tain, all of these cases have declined to directly confront this issue, finding instead that "the result was the same under either test." 355 F.3d at 91 (citing cases).

holding that the erroneous admission of a coerced confession had a substantial and injurious effect on the jury's decision. 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Court noted that the prosecutor made extensive use of the confession in its opening and closing statement, *id.* at 297–98, 111 S.Ct. 1246; *see also Chapman v. California,* 386 U.S. 18, 25, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that the confession was a crucial piece of evidence and not merely cumulative of other evidence, *Fulminante,* 499 U.S. at 296, 299, 111 S.Ct. 1246, and that the prosecution's case was weak absent inclusion of the confession, *id.* at 297–99, & 299 n. 9, 111 S.Ct. 1246; *see also Chapman,* 386 U.S. at 25–26, 87 S.Ct. 824 (observing that an error is less likely to be harmless if the case is a close one). In *Satterwhite v. Texas,* the Supreme Court held that the erroneous admission of a psychiatrist's testimony was not harmless error because this testimony appeared to be highly credible, the expert's testimony was unequivocal and heavily emphasized by the prosecution, and the expert provided the only piece of evidence on a crucial issue at the sentencing hearing. 486 U.S. 249, 260, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).

■ By distilling these Supreme Court precedents, we conclude that the Supreme Court has found the following factors to be relevant in determining whether the erroneous admission of a confession was harmless error.

(1) the overall strength of the prosecution's case;

(2) the prosecutor's conduct with respect to the improperly admitted evidence;

(3) the importance of the wrongly admitted testimony; and

(4) whether such evidence was cumulative of other properly admitted evidence.

*See also Wray v. Johnson,* 202 F.3d 515, 526–27 (2d Cir.2000) (reversing the district court's determination that the improperly admitted identification evidence was not harmless and discussing relevant factors); *see also United States v. Jean–Baptiste,* 166 F.3d 102, 109–10 (2d Cir.1999) (listing several factors to be considered in determining whether error was harmless).

*(1) The Prosecution's Case Was Weak*

■ *Cohen's Testimony:* Aaron Cohen, an illegal cab driver, testified that he rented a motel room at the Golden Gate Inn in Brooklyn for Zappulla and Jennifer under the name "Steve Greenberg." Cohen stated that he and Jennifer were close friends, and that he spent the earlier part of that day with her smoking crack. He testified that, on the evening that he obtained the room for Zappulla, Zappulla and Jennifer entered the motel through the side door so that they would not be noticed by the motel staff. He testified that he joined the couple at various times in the motel room to smoke crack. Cohen testified that he later went by the room and, while Jennifer was sleeping, Zappulla gave him some jewelry to sell and asked him to buy crack with the proceeds. After Cohen returned with the drugs, Zappulla asked him to use the remaining proceeds to pay for the room for another day. Later that day, Cohen called the motel room and spoke with Zappulla. When Cohen asked for Jennifer, Zappulla told him that they had fought and she had left.

Cohen's testimony was contradicted by other testimony and evidence at trial. Most importantly, although he testified that Zappulla had voluntarily given him the jewelry to sell for more crack, both Zappulla's confession and the testimony of another inmate (see *infra* Op. at 466) indicated that Jennifer stole the jewelry from Zappulla. Cohen's unsavory character was another basis to discredit his testimo-

ny. He admitted to being a crack user who ran an illegal taxi service and the desk clerk testified that Cohen regularly patronized the motel, sometimes with prostitutes and oftentimes using a pseudonym. Finally, as more fully discussed below, Cohen was potentially the other murder suspect because he was with Jennifer and Zappulla around the time of her death and had access to the motel room. Thus, Cohen's testimony against Zappulla at trial was unreliable.

*Motel surveillance tapes:* These tapes merely establish the undisputed fact that Zappulla stayed at the motel with Jennifer. Two surveillance cameras were located behind the front desk, and one was outside above the main entrance. None of them was hidden, and the one above the door was readily visible. The tapes indicate that Zappulla left the motel through the front door at 11:12 p.m. and then left through the front door again at 12:18 a.m.- meaning, during this hour, he had returned to the motel through the unmonitored side entrance. Between 11:56 and 12:11 a.m., motel records reveal that several telephone calls were made from Zappulla's motel room to various escort services. At 12:19 a.m., Zappulla returned through the front door of the motel and momentarily spoke with the motel's desk clerk. At 12:20 a.m., Zappulla was arrested in the hallway of the motel.[2] Based on this time line, Zappulla's murder of Jennifer must have occurred prior to 11:00 p.m. However, it seems odd that, after brutally murdering Jennifer in the heat of an argument, Zappulla would leave through the front door of the motel, knowing that the side door was an unmonitored exit (an exit that he had used in the past when he did not want to be detected), return to the motel room through the side door, call several escort services while inside the room with Jennifer's dead body, go back through the lobby and exit through the front door, and briefly converse with the front desk clerk. According to this time line, it is feasible that Zappulla acted this way because he was unaware that a murder had occurred in the motel room and that Jennifer's dead body had been hidden under one of the beds.

*Forensic Evidence:* When police discovered Jennifer's body underneath one of the motel beds, underwear was tied around her neck and a bloodstained towel was under the mattress. No attempt was made to test these items for any sort of forensic evidence. A pathologist testified that Jennifer died of strangulation and that she bled from her mouth and nose at the time of her death. The pathologist also testified that there were various cuts on her body in different stages of healing and there were wounds on her wrists from using needles. Although a DNA expert testified that the blood stains on Zappulla's boots, sweatshirt, and jacket were from Jennifer, it was not proved that her blood on Zappulla was from her final injury. If Jennifer had already been murdered and hidden under one of the beds when Zap-

---

**2.** The Time Line:

| | |
|---|---|
| 9:00 p.m.–11:00 p.m. | Jennifer is murdered. Zappulla is in the motel room. |
| 11:12 p.m. | Zappulla exits the motel through the front door. [At one point he returns to the motel through the side door] |
| 11:56 p.m.–12:11 a.m. | Several calls to escort services from Zappulla's motel room. |
| 12:18 a.m. | Zappulla exits through the front door of the motel again. |
| 12:19 a.m. | Zappulla enters though the front door and speaks to the desk clerk. |
| 12:20 a.m. | Zappulla is arrested in the motel hallway. |

pulla returned to the motel room (for example, to make telephone calls to escort services), a certain amount of her blood may have gotten on his clothes and boots without him realizing it. Indeed, there is no evidence in the record on appeal indicating the actual amount of blood found on Zappulla's clothing: whether it was innocuous, trace amounts of blood or whether the amount of blood on his clothing was substantial.

*Pabon's Testimony:* Felix Pabon was a fellow inmate who testified that, while he and Zappulla were incarcerated together, Zappulla told him that the incident involved a prostitute, where "some guys and some girls" all went to the motel room to get high on a considerable amount of illegal substances. Trial Tr. at 574–75. Zappulla allegedly told Pabon that he fell asleep and, when he awoke, he was missing some jewelry. He blamed the prostitute for taking the jewelry, physically abused her, choked her and some blood came out and got on the wall. He said he then broke her back and placed her under the mattress.

Pabon's testimony, however, was far from credible.[3] Most importantly, he admitted that he first learned about this case from an inmate law clerk who was preparing Zappulla's legal paperwork and that he

had read some of these papers.[4] Thus, there was another way for Pabon to have learned the details of Zappulla's case other than from a confession from Zappulla. Pabon was also testifying pursuant to a cooperation agreement with the Bronx District Attorney. In exchange for his testimony, Pabon would receive a maximum sentence of sixteen years in a medium security facility for a cocaine related offense, to run concurrently with a sentence in a Manhattan case. He was initially facing a sentence of 25 years to life in the Bronx case, and potentially 50 years to life in the Manhattan case, in which he was charged with the attempted murder of two individuals, thereby resulting in a total exposure of 75 years imprisonment. Thus, it goes without saying that the cooperation agreement offered to Pabon in exchange for his testimony was generous.

Pabon's credibility was significantly eroded by his extensive criminal record, which included the robbery of his brother's girlfriend, the knife-point robbery of his landlady, the possession of heroin with intent to sell, and the possession of an automatic weapon. He admitted to having a crack habit for approximately four to six years, and a heroin habit for another four to six years. He admitted that he would steal, lie, and rob people, even his own

---

3. As a general matter, we note that numerous scholars and criminal justice experts have found the testimony by "jail house snitches" to be highly unreliable. *See* Daryl K. Brown, Essay, *Rationing Criminal Defense Entitlements: An Argument From Institutional Design*, 104 COLUM. L. REV. 801, 824 (2004). Several reports have found that jailhouse informants have a significant incentive to offer testimony against other defendants in order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely fabricated. Thus, "the use of jailhouse informants to obtain convictions may be 'one of the most abused aspects of the

criminal justice system.'" Jana Winograde, Comment, *Jailhouse Informants And The Need for Judicial Use Immunity in Habeas Corpus Proceedings*, 78 CAL L. REV 755, 756 (1990); *see also* Comm'n on Capital Punishment, Report of the Governor's Commission on Capital Punishment 96,120, 158 (2002), *at* http://www.idoc.state.il.us/ccp/ccp/reports/commission_report/complete_report.pdf.

4. Although Pabon testified that Zappulla first showed him a copy of the indictment before Pabon spoke with the inmate law clerk, upon further questioning, Pabon admitted that he had not seen the indictment but instead another piece of "paper." Trial Tr. at 606–07.

family, in order to obtain money to purchase crack, and in fact, he continued to use and sell drugs while in prison. Finally, the reliability of Pabon's testimony is undermined by the fact that his testimony conflicted in several ways with testimony by other witnesses. Although he testified that Zappulla told him that Jennifer had stolen the jewelry, Cohen testified that Zappulla voluntarily asked him to sell the jewelry. Moreover, although Pabon testified that Zappulla told him that he "broke [Jennifer's] back," Trial Tr. at 575, the pathologist testified that her back had not been broken. Although Pabon testified that the incident involved "some guys and some girls," Trial Tr. at 574, there was no evidence that anyone other than Zappulla, Cohen and Jennifer participated in the crack binge.

*Other Circumstances Indicating That The Prosecution's Case Was Weak:* The Appellate Division and district court both ignored the fact that the first trial resulted in a hung jury. This event suggests that the case was close. The fact that the first jury deliberated for three days and ultimately could not reach a verdict indicates that the evidence was not so overwhelming that the outcome of trial was preordained. *Cf. Kyles v. Whitley,* 514 U.S. 419, 454, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("This is not the 'massive' case envisioned by the dissent . . . it is a significantly weaker case than the one heard by the first jury, which could not even reach a verdict."); *United States v. Ince,* 21 F.3d 576, 585 (4th Cir. 1994) ("Had the case against him been as strong as the Government would have us believe, it seems unlikely that the first jury would have ended in deadlock."); *Boyette v. Lefevre,* 246 F.3d 76, 92 (2d. Cir.2001) (holding that prosecution's failure to disclose *Brady* materials was not harmless error because the case against defendant was a close one, as shown in part by the fact that the first jury deadlocked).

The length and deliberative conduct by the jury at the second trial likewise suggests that a conviction was not assured, at least without the confession. *See, e.g., United States v. Jean–Baptiste,* 166 F.3d 102, 109–10 (2d Cir.1999) (finding plain error where jury deliberated for a day where factual issues were not complex); *United States v. Quiroz,* 13 F.3d 505, 513 (2d Cir.1993) (*Miranda* reversal where a guilty verdict resulted after three days of deliberations and *Allen* charge) (rehr'g granted in part on other grounds, denied in part, 22 F.3d 489 (2d Cir.1994)). Here, the jury deliberated for a full day in a straightforward single-count case, notwithstanding the extremely damaging nature of the confession. Specifically, at 11:15 a.m., the jury sought to examine the "key," "belt," and "underwear." At 12:20 p.m., the jury sought to examine the "signed statement," the "picture of body in frame," and the "picture of blood on wall." At 1:20 p.m., the jury sought to examine "all pictures." At 2:10 p.m., the jury sought to hear read-backs of testimony regarding "Blood–Palumbo," "Key–Officer recovering Key," and "Mr. Hahn." Finally, at 5:15 p.m., the jury reached a verdict.

*(2) The Prosecutor's Conduct With Respect To The Confession*

■ Another relevant consideration is whether the prosecutor found the erroneously admitted evidence to be important. *See Fulminante,* 499 U.S. at 297–98, 111 S.Ct. 1246 (noting that the prosecution emphasized the erroneously admitted confession in its opening and closing statement); *Satterwhite,* 486 U.S. at 260, 108 S.Ct. 1792 (finding that the prosecution emphasized the erroneously admitted testimony at the sentencing hearing). As a general matter, the prosecution knows intimately the strengths and weaknesses of its case. This observation is animated by *Ghent v.*

*Woodford*, where the Ninth Circuit, in a similar case, was especially persuaded by the fact that the prosecutor recognized the importance of the wrongfully admitted testimony. 279 F.3d 1121 (9th Cir.2002). In finding that admission of such testimony was not harmless error, the Ninth Circuit noted that "the fact that the State reordered its proof in the special circumstances [of a] retrial so as to make [the witness that provided the improper testimony] its second witness in its case-in-chief . . . reflects the State's firmly held belief that [this witness's] testimony was critical to proving [its case]." *Id.* at 1131.

In this case, although the witnesses and evidence at the first trial were essentially the same, the prosecution shifted its emphasis on and use of Zappulla's confession. At the first trial, the prosecutor's opening statement only referred to Zappulla's confession briefly whereas at the second trial, the prosecutor heavily emphasized Zappulla's confession, mentioning it as the first piece of evidence against him. Indeed, the prosecutor spent a page and a half of her eight-page opening statement detailing the confession. During her summation, the prosecutor again discussed the confession in detail, for example, by explaining how the confession tied in with other evidence in the case and how the confession was credible. Further, the prosecutor emphasized at summation that the confession provided vital evidence on the crucial issue of the motive. Indeed, to discount the suggestion that Cohen may have killed Jennifer, the prosecutor emphasized that it was Zappulla and not Cohen who signed the confession.

Significantly, the prosecutor used the confession extensively even though there was a strong likelihood that the confession would be found to have been improperly admitted on appellate review. As acknowledged by the Appellate Division, there were no New York cases that found that a 24-hour interval between the giving of *Miranda* warnings and a subsequent interrogation was constitutionally permissible. *People*, 282 A.D.2d at 697–98, 724 N.Y.S.2d 433. The fact that the prosecutor relied on the confession, thereby running the risk of reversal on appeal, tends to show that the prosecutor understood after the first trial that the confession was a crucial piece of evidence.

*(3) The Confession Was Evidence That Was Not Cumulative And Went To An Issue Central To The Case*

In making a determination of harmless error, the court should also consider the importance of the improperly admitted evidence. *See Satterwhite*, 486 U.S. at 260, 108 S.Ct. 1792 (noting that the erroneously admitted evidence was the only evidence that established the crucial issue at sentencing regarding future rehabilitation); *Fulminante*, 499 U.S. at 299, 111 S.Ct. 1246 (noting that the erroneously admitted "confession was *not* merely cumulative" of the other evidence at trial). In this case, the confession filled in a missing link to the prosecution's case: motive. The prosecutor acknowledged this at a hearing during trial by stating: "how do we show any motive of why the killing happened, other than by the defendant's own statement?" During summation, the prosecutor reiterated the fact that the confession established a motive for the killing. Although respondents argue that "proof of motive is not necessary to the prosecution's case or the jury's verdict," Gov't Br. at 54, this assertion is belied by numerous cases that hold that motive is often a central issue in murder cases. *See, e.g., United States ex rel. Vanderhorst v. Lavallee*, 417 F.2d 411, 414 (2d Cir.1969) (en banc) (indicating that establishing motive is central to a murder conviction); *People v. Bierenbaum*, 301 A.D.2d 119, 150, 748

N.Y.S.2d 563 (1st Dept.2002) ("There is little or nothing by way of circumstantial evidence that is more relevant or more probative [than evidence of motivation and intent] in a circumstantial murder case."). In this case, Cohen's testimony contradicted Pabon's testimony regarding whether Zappulla was angry at Jennifer for allegedly stealing the jewelry and giving it to Cohen to purchase more crack. According to Cohen, Zappulla *voluntarily gave him* the jewelry. Thus, Zappulla's confession resolved the apparent conflict between Cohen's and Pabon's testimony by making clear that Jennifer stole the jewelry and that this was why Zappulla was angry with Jennifer and why he ultimately killed her. *Cf. Boyette,* 246 F.3d at 93 (finding that improperly withheld *Blakely* materials was prejudicial error because it undermined the victim's credibility, which was a central issue at trial).

Proof of motive was especially important in this case because defense counsel suggested that Cohen was actually the murderer, and the prosecution strongly argued that Cohen could not be the killer. Zappulla's defense was not far-fetched. Cohen, a habitual crack user, was "very, very close friends" with Jennifer. He was therefore more likely to kill her than a random stranger, like Zappulla. Indeed, Cohen even admitted to having an argument with Jennifer prior to her death. He was familiar with the motel, originally rented the motel room for Zappulla, and thus, he could easily have had access to the motel room. Notably, any doubt regarding the identity of the killer could have been relieved had the prosecutor ordered forensic tests on the two articles that the killer clearly touched—the underwear found around Jennifer's neck and the blood-stained towel found under the bed. The prosecution, however, failed to do this. Moreover, there is no evidence in the record indicating whether the police also test-ed whether Cohen had traces of Jennifer's blood on his clothing. Thus, the only piece of evidence at trial that unequivocally and indisputably established that Zappulla was the murderer and not Cohen was Zappulla's own admission of guilt.

*(4) The Nature Of The Confession*

■ The persuasive influence of a signed confession cannot be underestimated. As noted by the Supreme Court in *Arizona v. Fulminante:*

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). Here, the district court correctly found that, "[u]nlike any other form of evidence—eyewitness testimony and DNA included—a confession to a crime is uniquely persuasive to a jury." *Zappulla,* 296 F.Supp.2d at 318 (citing one study which found that "73 percent of jurors will vote to convict even when admissions have been repudiated by the defendant and contradicted by the physical evidence."). The fact that the evidence at issue is a signed detailed confession should weigh heavily against finding that its erroneous admission was harmless.

\*     \*     \*     \*     \*     \*

■ The district court aptly noted that an "error in admitting the confession

should not *ordinarily* be deemed harmless absent a strong showing by the state that petitioner's guilt would have been assured based solely on the other evidence presented at trial." *Id.* (emphasis added). The district court, however, failed to sufficiently explain why this was not the ordinary case. To the contrary, notwithstanding the State's retrospective assurances, this was not a "slam-dunk" prosecution where the evidence overwhelmingly weighed toward conviction. Quite the opposite, the prosecution's theory was marred with discrepancies, inconsistencies, unreliable and conflicting testimony, shoddy forensic evidence, and logical gaps (*e.g.*, the lack of a motive, an inconsistent time line). The importance of the confession to the case was underscored by the prosecution's own conduct at the second trial, where it highlighted Zappulla's confession even though the admissibility of this evidence was tenuous. In light of these considerations, we are compelled to hold that the Appellate Division's conclusion, that the admission of Zappulla's confession was harmless, is objectively unreasonable. Based on the overall strength of the prosecution's case, the prosecution's conduct with respect to the improperly admitted confession, its importance in the second trial, and the fact that a written confession can never truly be said to be merely cumulative, we cannot conclude that it was objectively reasonable for the Appellate Division to decide that the state proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *See Mitchell*, 540 U.S. at 17–18, 124 S.Ct. 7. Accordingly, we must reverse.

III. *Zappulla's Confession to the Police Was Obtained In Violation Of His* Miranda *Rights*

██ The State argues that in the alternative this Court should find that Zappulla's confession was not coerced. The Ap-

pellate Division and the district court both held that the confession was obtained in violation of Zappulla's *Miranda* rights. This holding is undoubtedly correct. Zappulla was initially questioned upon arrest at the police stationhouse at 1:20 a.m. on March 17, 1998. At that time, the interrogating officers read him his *Miranda* rights and asked him whether he was willing to speak about the theft of his girlfriend's fur coat and jewelry. He refused to speak about that but spoke about other matters. Late in the afternoon on March 17th, Zappulla broke free from police custody and, as he was fleeing, was struck by a car. He was recaptured and taken to the hospital for examination. Following Zappulla's return to police custody, at 12:30 a.m. on March 18, he was again questioned, but this time without a statement of his *Miranda* rights and about the much more serious crime of murder.

The Appellate Division found that Zappulla's confession was not voluntary and should have been suppressed. *People*, 282 A.D.2d at 697–98, 724 N.Y.S.2d 433. The Appellate Division relied on the fact that: (1) 24–hours had lapsed between the giving of *Miranda* warnings and the questioning of Zappulla about Jennifer's murder; (2) Zappulla was not in continuous police custody between the initial giving of *Miranda* warnings and the subsequent interrogation; and (3) the second interrogation concerned a crime unrelated to that for which he was initially arrested. On habeas review, the district court properly adopted these finding in affirming the Appellate Division's decision. *Zappulla*, 296 F.Supp.2d at 318.

Considering the "totality of the circumstances," *Fulminante*, 499 U.S. at 286, 111 S.Ct. 1246, we conclude that the admission of Zappulla's confession constitutes a violation of Zappulla's due process rights. *See Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

Accordingly, we reject the State's alternative argument on appeal.

In conclusion, as Judge Richard S. Arnold reminded us:

> A system of law that not only makes certain conduct criminal, but also lays down the rules for the conduct of authorities, often becomes complex in its application to individual cases, and will from time to time produce imperfect results, especially if one's attention is confined to the particular case at bar. Some criminals do go free because of the necessity of keeping government and its servants in their place. That is one of the costs of having and enforcing a Bill of Rights. This country is built on the assumption that the cost is worth paying, and that in the long run we are all both freer and safer if the Constitution is strictly enforced.

*Williams v. Nix*, 700 F.2d 1164, 1173 (8th Cir.1983). With Zappulla's unconstitutionally obtained confession in mind, it may not be too difficult to look at other evidence and conclude that Zappulla would have been convicted in any event. The unlawfully obtained confession, however, was far and away the most convincing evidence of his guilt. *See Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246. We conclude that it was "objectively unreasonable" for the Appellate Division to decide "beyond a reasonable doubt that [the trial court's wrongful introduction of the unlawfully obtained confession into evidence] did not *contribute to* the verdict obtained."

*Mitchell*, 540 U.S. at 17–18, 124 S.Ct. 7 (emphasis added). We do not think it too much to require the State to return to the trial court and attempt to convict Zappulla without the unconstitutionally obtained confession. If the dissent's analysis is right, by following it, the State should not find it difficult to properly obtain a conviction. Requiring the State to try is one of the costs of having and enforcing a Bill of Rights.

### CONCLUSION

For the reasons stated above, we hereby REVERSE the district court's denial of a writ of habeas corpus, VACATE Zappulla's state conviction for murder, and REMAND to the district court with instructions to grant the petition for a writ of habeas corpus unless the State grants a new trial within a reasonable period.

RAGGI, Circuit Judge, dissenting.

A five-justice panel of the New York State Supreme Court, Appellate Division, Second Department, ruled that Guy Zappulla's signed confession to the murder of Jennifer Scarpati was inadmissible because the police failed to re-administer the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *People v. Zappulla*, 282 A.D.2d 696, 697, 724 N.Y.S.2d 433, 434 (2d Dep't 2001).[5] Those same judges, however, unanimously concluded that the error was harmless beyond a reasonable doubt because the remaining evidence of Zappulla's

---

**5.** As the majority notes, Zappulla had received *Miranda* warnings approximately twenty-four hours earlier when he was initially arrested in connection with the theft of jewelry and a fur coat from his girlfriend, Margaret Tarulli. *See supra* at [465]. He was no stranger to these warnings; Zappulla had ten prior convictions, four for felony crimes, including one for racketeering with a predicate of solicitation to commit murder. *See*

Sentencing Tr., Mar. 30–31, 1999, at 4–5, 13. On the occasion here at issue, Zappulla agreed to speak with authorities but only discussed matters unrelated to the theft. The Appellate Division concluded that the lapse of time between the two interrogations and the difference in the crimes at issue required *Miranda* warnings to be re-administered. *See People v. Zappulla*, 282 A.D.2d at 697, 724 N.Y.S.2d at 433.

guilt was overwhelming. *See id.* at 698, 724 N.Y.S.2d at 435. Addressing this issue on Zappulla's habeas corpus challenge to his state murder conviction, *see* 28 U.S.C. § 2254, District Judge Jack B. Weinstein also determined that the *Miranda* error in Zappulla's case was harmless: "Under the circumstances of this case and in light of the overwhelming evidence of petitioner's guilt, there is no reasonable probability that the introduction of his un-*Mirandized* inculpatory statement had a substantial and injurious effect or influence in determining the jury's verdict or that it resulted in actual prejudice to petitioner." *Zappulla v. New York*, 296 F.Supp.2d 309, 319 (E.D.N.Y.2003) (applying "actual prejudice" standard of review articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Because I agree with these able judges' assessment of the record in this case, I respectfully dissent from the ruling of my colleagues in the majority that it was "objectively unreasonable" for a court to conclude "beyond a reasonable doubt" that the erroneously admitted confession "did not contribute to the verdict obtained." *Supra* at [474].

There is no question in this case that the Appellate Division applied the correct standard of harmless error review on direct appeal. *See People v. Zappulla*, 282 A.D.2d at 698, 724 N.Y.S.2d at 436 (citing *People v. Crimmins*, 36 N.Y.2d 230, 237, 367 N.Y.S.2d 213, 218, 326 N.E.2d 787 (1975), which expressly adopted the "harmless beyond a reasonable doubt" standard of direct review stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Accordingly, our ability to grant habeas relief is narrowly circumscribed by 28 U.S.C. § 2254(d)(1). Specifically, we may not grant a writ of habeas corpus simply because we conclude that the state court erred in finding admission of the un-*Mirandized* confession harmless; "rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003); *see also Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (rejecting the use of a "clear error" standard to assess objective unreasonableness because it "fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness").

As I understand the majority opinion, its determination that the state court's harmlessness conclusion was not simply wrong but "objectively unreasonable" turns on four factors: (1) the weakness of the prosecution's case against Zappulla without the signed confession, (2) the prosecution's heavy reliance on the signed confession in making its case to the jury, (3) the fact that the confession was not cumulative but of singular importance to the establishment of Zappulla's motive for killing Scarpati, and (4) the particular persuasive influence of a signed confession.[6]

---

**6.** The majority's opinion might be read to hold that a determination of objective unreasonableness by itself warrants granting a writ of habeas corpus. Some of our sister circuits, however, have concluded that a second step of analysis is required.

Most recently, in *Medina v. Hornung*, the Ninth Circuit ruled that a federal court engaged in habeas review of a harmless error challenge should (1) "determine whether the state court's harmless error analysis was objectively unreasonable," and, if it was, (2) "engage in a *Brecht* analysis" of the error. 372 F.3d 1120, 1126 (9th Cir.2004). The Seventh and Tenth Circuits have also approved a two-step review. *See Aleman v. Sternes*, 320 F.3d 687, 690–91 (7th Cir.), *cert. denied*, 539 U.S. 960, 123 S.Ct. 2653, 156 L.Ed.2d 659 (2003) (noting that a federal court may grant habeas relief only if it finds

For the reasons stated in this dissent, I am not convinced that the majority's conclusions as to the first three factors are so compelled by the record that a contrary view by the state court must be deemed "objectively unreasonable." As for the last factor, I note simply that at the same time that the Supreme Court in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), made the point emphasized by the majority—that a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him," *id.* at 296, 111 S.Ct. 1246—it ruled that even a coerced confession was subject to harmless error analysis and may be rendered innocuous if the remaining evidence against the defendant is so overwhelming as to leave no reasonable possibility that the tainted confession contributed to conviction, *id.* at 310–11, 111 S.Ct. 1246;[7] *see also Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (holding that admission of defendant's confession was harmless beyond a reasonable doubt where the admissible evidence was so overwhelming as to render the confession cumulative). Indeed, Judge Weinstein fully recognized the prejudicial potential of an erroneously admitted confession but, nevertheless, concluded that the error in this case could reasonably be deemed harmless in light of overwhelming admissible evidence of Zappulla's guilt. *See Zappulla v. New York,* 296 F.Supp.2d at 319.

### 1. The Overwhelming Admissible Evidence of Zappulla's Guilt

Shortly after 6:00 p.m. on March 17, 1998, New York City police officers found Jennifer Scarpati's dead body stuffed under the mattress and box spring of a bed in Room 234 of the Golden Gate Inn in Brooklyn, New York. She had been strangled to death, causing blood vessels to burst around her eyes and in her neck, and blood to flow from her nose and mouth. A blood-stained towel lay on the floor near her body, and a blood stain was also visible on the wallpaper at the level of the bedframe.

In contrast to the majority, I conclude that, even without Zappulla's challenged confession, his commission of this brutal crime was established by overwhelming evidence. *See, e.g., United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993) (per curiam) (observing that the "strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless"). Specifically, (a) extensive testimonial and physical evidence established that Zappulla was with Scarpati at and about the time of her death in the room they shared at the Golden Gate Inn; (b) when Zappulla was arrested on unrelated charges in a hallway of that motel at 12:20 a.m. on March 17, 2004, Scarpati's blood was on his jacket, sweat-

---

that the state court unreasonably applied *Chapman* and the error is cognizable under *Brecht* ); *Saiz v. Burnett,* 296 F.3d 1008, 1012 (10th Cir.2002) ("[T]he proper question on federal habeas review is whether the Colorado appellate court's application of the *Chapman* standard was objectively unreasonable .... [If a court concludes that it was], the court should engage in an independent harmless error analysis applying the standard articulated in *Brecht v. Abrahamson*.").

I expect the majority would conclude that the result it reaches today would pertain even

under the two-step analysis employed by the Seventh, Ninth, and Tenth Circuits. Nevertheless, it would be useful to clarify whether in this circuit (1) a second step of analysis is necessary, and, if so, (2) that step requires *Brecht* or *Chapman* review.

**7.** In this case, no evidence indicates that Zappulla's confession was the product of any coercion. The inadmissibility of the evidence is based solely on a failure to re-administer *Miranda* warnings.

shirt, pants, and boots; and (c) while in custody, Zappulla admitted to a fellow inmate, Feliz Pabon, that he had killed Scarpati, providing even more detail as to the commission of the crime than he had in his written confession.

### (a) *Evidence that Zappulla Was with Scarpati At and About the Time of Her Death*

Testimonial proof that Zappulla was with Scarpati at and about the time of her death was supplied by gypsy cab driver Aaron Cohen, who stated that he had brought Scarpati and Zappulla to the Golden Gate Inn after the trio, together with another trial witness, Bruce Brodsky, had spent part of the day on Brodsky's boat smoking crack cocaine. Indeed, Cohen admitted that he had rented the room for Scarpati and Zappulla to allow the couple to conceal their presence at the hotel. Apparently, Scarpati, who worked as a prostitute, had a particular interest in discretion: motel management had barred her from the premises. Over the course of the next twenty-four hours, Cohen occasionally joined Scarpati and Zappulla in the room to smoke crack. On one occasion, Zappulla gave Cohen some jewelry to sell in order to purchase crack. At approximately 5:00 a.m. on March 16, 1998, Cohen called Room 234, asking to come over with another prostitute. Zappulla denied the request, saying he wished to sleep. When Cohen called the room at 2:00 p.m. the same day and spoke with Scarpati, she berated him for this request. Cohen again called the room sometime between 5:00 and 5:30 p.m. and asked about Scarpati; Zappulla told him that they had had a fight, and he did not know where she was.

Although the majority cites Cohen's criminal record, drug abuse, and occasional use of an alias to dismiss him as an "unreliable" witness against Zappulla, *supra* at [468–69], it appears that this "unreliability" pertains primarily to Cohen's account of the jewelry exchange, a point discussed more particularly at Part 3 of this dissent, and his report of a fight between Zappulla and Scarpati. His testimony that Zappulla was with the murder victim in Room 234, however, was so heavily corroborated that the majority characterizes this fact as essentially "undisputed." *Supra* at [469].

Indeed, the principal piece of corroboration putting Zappulla in Room 234 could not be impeached: a key for that motel room was found in Zappulla's pocket after his initial arrest on March 17.[8] Further, not only was Zappulla arrested at the Golden Gate Inn, the murder site, motel surveillance cameras established his presence on the premises at various times in the interval between 9:00 p.m. on March 16, 1998, and 12:20 a.m. on March 17, 1998, which was consistent with the estimated time of Scarpati's death.

Certainly, these surveillance tapes, like the key, do not conclusively establish that Zappulla murdered Scarpati. What they do demonstrate, however, is his opportunity to commit the crime. The majority is not content to note this distinction. Instead, it suggests that the tapes actually demonstrate the unlikelihood of Zappulla's being Scarpati's murderer. *Supra* at [469]. Preliminarily, let me note that I do not understand this to be a case in which anyone asserts Zappulla's actual innocence. To the contrary, given that the legal defect with his signed confession is a failure to re-administer *Miranda* warnings, with no evidence of compulsion, there can be no serious question in this court

---

8. Zappulla was first arrested on his girlfriend's March 15, 1998 complaint that he had broken into her apartment, threatened her, and taken jewelry and a fur coat.

that Zappulla did, in fact, murder Jennifer Scarpati. Thus, the only issue before us is whether the erroneous admission of the un-*Mirandized* confession could reasonably have been ruled harmless beyond a reasonable doubt. That being said, I will briefly explain why I do not share my colleagues' view that the tapes favor Zappulla.

The majority states that for Zappulla to have murdered Scarpati, the crime "must have occurred prior to 11:00 p.m." *Supra* at [469]. While I agree that Zappulla could have committed the murder before 11:00, it is also possible that he committed the crime sometime between his recorded 11:12 p.m. and 12:18 a.m. departures from the motel, depending on when he returned to the room, presumably through the unmonitored side door. The majority, however, concludes that a time line derived from the tapes makes these scenarios unlikely because

> it seems odd that, after brutally murdering Jennifer in the heat of an argument, Zappulla would leave through the front door of the motel, knowing that the side door was an unmonitored exit . . . return to the room through the side door, call several escort services while inside the room with Jennifer's dead body, go back through the lobby and exit through the front door, and briefly converse with the front desk clerk. According to this time line, it is more likely that Zappulla acted this way because he was unaware that a murder had occurred in the motel room and that Jennifer's dead body had been hidden under one of the beds.

*Id.* at [469–70]. The fact that murderers act in ways that strike law-abiding persons as "odd" is no new phenomenon. Indeed, in this case we know that Zappulla acted in just the "odd" way described by the majority and, nevertheless, killed Scarpati. Thus, I cannot fault the state court for

failing to share the majority's view that the surveillance evidence is favorable to Zappulla. To the contrary, I consider it entirely reasonable for the Appellate Division to have cited this evidence, together with Cohen's testimony and Zappulla's possession of the motel room key, as overwhelming proof, independent of the signed confession, that Zappulla was with Scarpati at and about the time of her death. *See People v. Zappulla*, 282 A.D.2d at 698, 724 N.Y.S.2d at 435.

(b) *Scarpati's Blood on Zappulla's Clothing on the Day of Her Death*

A medical examiner testified that soon after her death, Jennifer Scarpati bled from the nose and mouth. This grim fact allowed her to provide some of the most powerful evidence against Zappulla, identifying him as her murderer with her own blood.

Specifically, Scarpati's blood was found in ten different locations on the clothing Zappulla was wearing at the time of his March 17 arrest at the Golden Gate Inn: (1) on the right sleeve cuff of his sweatshirt; (2) on the left front of his sweatshirt, beneath the chest area; (3) in the right knee area of his jeans; (4) in the left knee area of his jeans, (5) on the back of the left knee area of his jeans, toward the calf; (6) underneath the left pocket of the jeans; (7) several stains along the instep of his right boot; (8) in a lug on the heel of his right boot; (9) on the back of his jacket, near the left shoulder blade; and (10) on the back of his jacket, further toward the bottom. *See* Trial Tr. at 426, 432. This evidence, together with the aforementioned proof that Zappulla was with Scarpati in the room where she died at and about the time of her death, would, by itself, permit a reasonable jury to conclude beyond a reasonable doubt that he was the murderer.

Without detailing the extent of this blood evidence, the majority dismisses it as inconclusive, noting that the record fails to indicate whether the blood stains were "innocuous, trace amounts" or "substantial." *Supra* at [470]. In fact, trial testimony by both a police detective and a forensics examiner reveals that the stains were not innocuous; most were visible to the naked eye, even though Zappulla's clothing was generally dark-colored. *See* Trial Tr. at 278, 435–36.

The majority further notes that no prosecution witness could testify as to how or when Scarpati's blood came to be on Zappulla's clothes. Pointing to evidence that Scarpati had "various cuts on her body in different stages of healing" and "wounds on her wrists from using needles," *supra* at [469], it suggests that this offers an alternative innocent explanation for the blood on Zappulla's clothes. It further hypothesizes that if Scarpati "had already been murdered and hidden under one of the beds when Zappulla returned to the motel" after 11:00 p.m. on March 16, "a certain amount of her blood may have gotten on his clothes and boots without him realizing this." *Supra* at [470].

Given that the needle marks were described as "pinpoints," Trial Tr. at 332, and the cuts as "healing abrasions," *id.* at 344, I respectfully suggest that it strains common sense to think that they explain the number of blood stains on Zappulla's clothing or their myriad locations, spanning Zappulla's sleeve, shirt front, pants legs, jacket back, boot instep, and even a lug on his boot heel. Even more implausi-

ble is the suggestion that Zappulla could have received so many blood stains in so many different locations on his clothing without realizing that he was coming into contact with blood or that Scarpati's dead body was hidden in their room. Indeed, this hypothesis is undermined by the fact that the blood stains on the back of Zappulla's jacket were consistent with droplets of fresh blood, not smears from blood already fallen onto some other site with which Zappulla came into inadvertent contact. *See* Trial Tr. at 439. Moreover, the numerous blood stains must be considered in light of the undisputed evidence that Scarpati's murderer did not simply kill her and leave; he hid the body under the mattress and box spring, which means he had to move it. In this context, the logical inference to be drawn from the number, type, and sometimes curious locations of the blood stains on Zappulla's clothing, is that Zappulla killed Scarpati, and when he hoisted her dead body to place it underneath the box spring, blood from her nose and mouth dripped directly onto the back of his jacket. Meanwhile, in maneuvering her body under the box spring, her blood also smeared onto the front his sweatshirt, his shirt sleeve, the front and back of his pants, and even the top and bottom of his boots. Because any other conclusion about the blood evidence is too improbable to make sense, it was not "objectively unreasonable" for the Appellate Division to view this compelling forensics evidence of Zappulla's guilt as further support for a finding of harmless error. *See People v. Zappulla*, 282 A.D.2d at 698, 724 N.Y.S.2d at 435.[9]

---

**9.** The majority faults the prosecution for "shoddy forensics" work in this case, asserting that "any doubt regarding the identity of the killer could have been relieved had the prosecutor ordered forensic tests on the two articles that the killer clearly touched—the underwear found around Jennifer's neck and

the blood-stained towel found under the bed." *Supra* at [473].

It is unclear what forensics tests the majority has in mind. Trial testimony indicated that fingerprints, which investigators did, in fact, lift from other items in the motel room, can rarely be retrieved from cloth exhibits, a con-

(c) *The Detailed Admissions to Felix Pabon*

Although the circumstantial evidence of Zappulla's guilt was remarkably strong in this case, the prosecution also offered direct proof of guilt in the form of admissions made by Zappulla to Felix Pabon, an inmate with whom he was incarcerated in July 1998.

In many cases, the admission of a substantially similar confession, without constitutional infirmity, will suffice to render an erroneously admitted statement cumulative and, therefore, harmless. *See, e.g., Parsad v. Greiner,* 337 F.3d 175, 185 (2d Cir.2003) (finding harmless error when erroneously admitted statements were cumulative of properly admitted statements); *Tankleff v. Senkowski,* 135 F.3d 235, 245–46 (2d Cir.1998) (admission of defendant's un-*Mirandized* statements was harmless beyond a reasonable doubt because those statements were "substantially the same as some of his later, admissible confession[s]"); *Rollins v. Leonardo,* 938 F.2d 380, 382 (2d Cir.1991) (affirming district court's harmless error determination that defendant's un-*Mirandized* confession was merely cumulative of subsequent confession and other overwhelming evidence of guilt); *Campaneria v. Reid,* 891 F.2d 1014, 1022 (2d Cir.1989) (error in admitting defendant's confession in violation of *Miranda* was harmless where the confession was "entirely cumulative" and "did not contain anything that [the defendant] had not already stated in his earlier [admissible] statements").[10]

This is especially true where the admissible evidence encompasses a more complete and detailed description of the offense than the confession that should have been suppressed. *See, e.g., Nova v. Bartlett,* 211 F.3d 705, 709 (2d Cir.2000) (error in admitting defendant's statement in violation of *Miranda* was harmless where defendant subsequently made more complete, detailed confessions that were admissible); *United States v. Daniel,* 932 F.2d 517, 521–22 (6th Cir.1991) (where defendant's second, admissible statement "supplied greater information" than the

---

clusion that would seem obvious with respect to terry cloth. In any event, there is no contrary evidence in the record before us. As for DNA analysis, nothing in the record even suggests that there was any genetic material on the towel other than Scarpati's blood. Even if there were, or if Zappulla's semen had been identified on Scarpati's underpants, that would hardly relieve "any doubt" that he was the murderer. Zappulla had occupied Room 234 with Scarpati for more than twenty-four hours; the fact that he might have used a towel in that room or had sexual relations with Scarpati would hardly be surprising.

This is not to suggest that such forensics evidence—if it could have been procured—would have been irrelevant. I simply do not join in the majority's harsh criticism of the investigative efforts in this case. Law enforcement authorities did secure the forensics evidence that speaks loudest in identifying Scarpati's murderer: her own blood at numerous locations on the clothing Zappulla was wearing at the time and site of her death.

10. Although the majority conclusorily asserts that "a written confession can never truly be said to be merely cumulative," *supra* at [474], case law is to the contrary. *See United States ex rel. Moore v. Follette,* 425 F.2d 925, 928 (2d Cir.1970) (Friendly, J.) (noting that "the case where admission of an improperly obtained confession can be considered harmless error is exceedingly rare," the court, nevertheless, rules the defendant's transcribed confession harmless precisely because it was cumulative of other evidence); *accord Campaneria v. Reid,* 891 F.2d at 1022 (concluding that receipt of even video-recorded confession was harmless where cumulative of other evidence); *see also Boles v. Foltz,* 816 F.2d 1132, 1135–36 (6th Cir.1987) (holding that defendant's "taped confession was merely a reiteration of his first [unrecorded] confession and therefore cumulative"); *Martin v. Wainwright,* 770 F.2d 918, 926, 932–33 (ruling admission of video-taped confession was "merely cumulative" of other evidence).

first, unconstitutional confession, the first confession was "cumulative and unnecessary to establishing the case against the defendant" and its inclusion harmless error); *Martin v. Wainwright*, 770 F.2d 918, 932–33 (11th Cir.1985) (admission of confession obtained in violation of *Miranda* was harmless error where subsequent confession was not only cumulative of evidence contained in earlier confession, but in fact contained far more detailed description of the murder).

Further, the inoculating effects of an admissible confession are particularly strong where the incriminating statements therein are corroborated by independent evidence. *See United States v. Newton*, 369 F.3d 659, 679 (2d Cir.2004) (finding erroneous admission of defendant's inculpatory statement of gun possession harmless beyond a reasonable doubt because the defendant had essentially acknowledged ownership of the gun in another properly admitted statement, which was corroborated by additional testimony); *United States ex rel. Moore v. Follette*, 425 F.2d 925, 928 (2d Cir.1970) (finding admis-

sion of an improperly obtained confession harmless because a second, admissible confession covered every element of the crime and was supported by corroborating evidence).

In this case, Zappulla's admission to Pabon was considerably more detailed about events related to Scarpati's murder than his signed confession to the police. Further, the details were extensively corroborated by other forensic and testimonial evidence.

For example, in his admissions to Pabon, Zappulla specifically identified his victim as a "prostitute," Trial Tr. at 569, a detail not mentioned in his confession to the police but corroborated by the testimony of Aaron Cohen, *see id.* at 151.[11] Similarly, Zappulla told the police little about the circumstances leading to his arrival at the Golden Gate Inn, but in his admission to Pabon, he stated that the motel stay was preceded by an incident where he had "dis'd" his "wife." *Id.* at 574. Later, he saw police outside his house, prompting him to go to a motel "with a couple of

---

11. To facilitate comparison with Zappulla's admission to Pabon, I reproduce the police confession, as read at trial, deleting exchanges between counsel and the witness during this reading:

On March 18, 1998, at 0115 hours, the undersigned [Detective McMahon and] Detective Delahunt, were present at the 61 Precinct Detective Squad Room. Guy [Zappulla] stated that he would rather tell his story to the District Attorney. He wanted to speak with them about pleading guilty and getting this over with as quickly as possible. He also stated that he wanted to know how long of a sentence he would be facing.

Guy was questioned further and stated that a male he knows as Teamo or Aaron had rented the room at the Golden Gate Motel on Sunday and Monday. Guy went down to the front desk sometime on Monday to pay $10 for the phone. He stated that he had been getting high for three days.

Guy stated that he had gone to the room with his girlfriend Margaret's fur coat and jewelry. Sometime on Monday he noticed that Aaron, who had left the room, returned with more drugs. Aaron said that he had used Margaret's jewelry to get the drugs. Guy stated that he got mad because Aaron and Jennifer had taken advantage of him while he was high. He never gave them permission to sell Margaret's jewelry. He got mad but stated that he still used the drugs.

Aaron left the room, and Guy states that he started to argue with Jennifer about the jewelry. Guy stated Guy threatened to call the police. He states that that's when Jennifer started to fight with him. He fought back and choked her. Guy didn't know if she was dead. She was unconscious when he left the room.

Trial Tr. at 495–98.

people, some guys and girls," where they all got "high on crack, marijuana, alcohol and pills." *Id.* The majority cites an error in this account, noting that only one "girl," Scarpati, was with Zappulla at the motel. *Supra* at [470–71]. But the error seems trivial when compared to the accuracy of the numerous other details attributed to Zappulla by Pabon. Notably, Zappulla's disclosure to Pabon that he had gone to the motel with more than one person was correct, as Aaron Cohen confirmed. *See* Trial Tr. at 159–61. Moreover, Zappulla told Pabon, but not his arresting officers, about a domestic dispute that had resulted in police coming to his home, a detail confirmed by his girlfriend's March 15, 1998 police report that Zappulla had threatened her and stolen her fur coat and jewelry. *See* Hearing Tr. at 35, 55, 140. Further, Pabon's account that Zappulla admitted using crack, marijuana, and pills in the motel room was corroborated by the discovery of these substances by crime scene detectives. *See* Trial Tr. at 360–63.

According to Pabon, Zappulla also stated that he killed Scarpati when he discovered that "he was missing some of his jewelry that he had in his pocket." *Id.* at 575. That Zappulla kept his girlfriend's jewelry in a pocket was not revealed in his signed confession; nevertheless, this fact was confirmed by police recovery of jewelry from one of his pockets in the course of a post-arrest search. *See id.* at 20–21, 27.

With respect to the circumstances of Scarpati's death, Zappulla's signed confession and his admission to Pabon were substantively identical, though each statement contained details omitted from the other. In his signed confession, Zappulla stated that his argument with Scarpati was preceded by an argument with Aaron Cohen when the taxi driver brought drugs to the motel room that he had acquired by selling jewelry. Zappulla reported that "he got

mad because Aaron and Jennifer had taken advantage of him while he was high"; he insisted that "[h]e never gave them permission to sell [his girlfriend's] jewelry." *Id.* at 497. After Cohen left the motel room, Zappulla started to argue with Scarpati about the missing jewelry, threatening to report her to the police. Zappulla claimed that Scarpati then attacked him, and he responded by choking her. He stated that when he left the room, Scarpati was unconscious, but Zappulla did not know whether she was dead. *See id.*

In his admission to Pabon, Zappulla made no mention of Aaron Cohen's involvement with his jewelry. He reported waking up in the motel room, discovering some jewelry missing, blaming Scarpati, and starting to "beat" her before he "choked her to death." *Id.* at 575–76. Pabon recalled Zappulla telling him that when he killed Scarpati, "some blood ... came out" of the victim. *Id.* at 575. Although Zappulla was not specific as to the site of the bleeding, he did tell Pabon that some of the blood stained the wall. *See id.* Zappulla further told Pabon that "he broke [Scarpati's] back and put her under the mattress." *Id.* These details, omitted from the signed confession, are significant in several respects. That Zappulla beat as well as strangled Scarpati finds corroboration in the medical examiner's discovery of hemorrhages on the dead woman's head, which were consistent with either blows or a fall. *See id.* at 336. That Scarpati bled visibly as a result of the strangling—from her nose and mouth—was similarly corroborated by the medical examiner. *See id.* at 331, 338–39. Crime scene evidence also confirmed that some of Scarpati's blood was found on the wall adjacent to the bedframe where her body was hidden. *See id.* at 216–18, 339. Finally, although the medical examiner reported no fractures to Scarpati's back, her body was certainly found where Zappulla told Pabon

he had hidden it: under the mattress. Moreover, crime scene photographs apparently depicted the body shoved into the bed frame at such a distorted angle that Zappulla might well have thought that he had broken his victim's back. *See* People's Exh. 15; Hearing Tr. Feb. 9, 1999 at 57 (describing finding Scarpati's body "in a U-shape[ ]—stuffed under the bed").

Zappulla also shared with Pabon numerous details about events after the murder that he had not mentioned in his police confession. Zappulla explained that after leaving the motel, he realized that he had forgotten to take the fur coat out of the room and went back to retrieve it. At that time, police officers, who were at the motel to investigate an unrelated incident, stopped Zappulla, leading to his arrest. This sequence of events is corroborated by the motel surveillance tape, which shows Zappulla's 12:18 a.m. departure from the motel followed by a 12:19 re-entry. It is also corroborated by police testimony that an unrelated investigation about an argument at the motel had brought officers to the scene. At 12:20 a.m., they encountered Zappulla in a hallway and arrested him when one of the officers recognized him from a photograph disseminated at the station earlier that day. *See* Trial Tr. at 379–82, 463. Further corroborating this part of Pabon's account is the fact that a fur coat was indeed still in the motel room at the time of the arrest.

Pabon also testified that in a subsequent conversation, Zappulla told him that he expected to "beat" his case because paperwork provided by his lawyer indicated that police had conducted a warrantless search of his motel room on the morning of March 17, 1998. *Id.* at 578. The statement was corroborated by the fact that at approximately 8:45 a.m. on March 17, there was a warrantless entry into Room 234 by a hotel employee accompanied by two police officers who remained outside. *See id.* at 247–48. Later in the day, pursuant to a search warrant, police entered the room and found Scarpati's dead body.

As the majority notes, in considering whether Zappulla's admission to Pabon renders harmless Zappulla's un-*Mirandized* confession, careful scrutiny of Pabon's credibility is required. He is, after all, a convicted felon with an extensive and serious criminal record and a history of drug abuse, both in and out of prison. Further, he testified pursuant to a cooperation agreement with the prosecution, which he hoped would result in a reduced sentence on pending charges against him. These circumstances do not, however, make it "objectively unreasonable" for a state court to have relied on Pabon's testimony in making its harmlessness determination.

The extraordinary detail in the statements attributed to Zappulla by Pabon together with extensive corroboration of these details preclude a conclusion that Pabon simply fabricated the admissions to which he testified out of whole cloth. The majority nevertheless suggests that "there was another way" for him "to have learned the details of Zappulla's case other than from a confession from Zappulla." *Supra* at [12]. Specifically, he might have heard these details from an "inmate law clerk who was preparing Zappulla's legal paperwork," [12] or he might have read them in

---

12. Although Pabon testified that the inmate law clerk helped prisoners analyze their case, read police paperwork, and prepare legal motions, it is not clear that he ever prepared papers for Zappulla who, after all, was represented by counsel in connection with his pending trial. The testimony indicates simply that Zappulla told Pabon that the inmate was generally helping him.

legal papers shown to him by Zappulla himself. *Id.*

The problem with this theory is that it derives largely from Pabon's acknowledgment (1) that an inmate law clerk first told him that the victim in Zappulla's murder case was a woman—until that time, Pabon had simply assumed that Zappulla had killed a man, *see* Trial Tr. at 568—and (2) that Zappulla himself had shown him certain documents, specifically, a list of the charges against him, a list of grievances he was maintaining against his wife/girlfriend, and a photocopied picture of the victim's body, which Pabon stated was so dark that little was discernable, *id.* at 607–08. This conversation and the identified documents might have given Pabon some information about Zappulla's case, but hardly the extensive details about which he testified.

Pabon acknowledged that Zappulla had other documents pertaining to his case in his prison cell, but he denied seeing these papers or having any further conversations with the inmate law clerk about Zappulla's case. Of course, a jury is not required to believe a witness's denials, but that does not mean that a reviewing court, which has not observed the witness's demeanor, may speculate that the fact denied is the truth. *See generally Dyer v. MacDougall,* 201 F.2d 265, 269 (2d Cir. 1952) (L.Hand, J.) (holding that witness demeanor may persuade a jury to "assume the truth of what he denied," but a court cannot allow a case to go to the jury on such evidence). In this case, although the record indicates that Zappulla had copies of unspecified legal documents in prison, it nowhere demonstrates that the particular factual details attributed to Zappulla by Pabon were contained in these documents,[13] much less that Pabon had seen these materials. In any event, Pabon's powers of memory and synthesis would have had to have been extraordinary to cull from diverse court papers, police reports, and forensics analyses, the detailed admissions he attributed to Zappulla.

In sum, I do not agree with the majority's conclusion that the admissible evidence of Zappulla's guilt was weak.[14]

---

**13.** Nothing in the record indicates whether in July 1998, Zappulla's papers were limited to documents filed in court, such as the complaint, indictment, motions, and transcripts of appearances, or whether he had also, by that date, received materials usually provided closer to or at trial, for example, witness statements, forensics reports, documentary exhibits, etc. Zappulla did not first stand trial for Scarpati's murder until February 1999.

**14.** The majority cites as further evidence of the "weakness" of the prosecution case—even with the un-*Mirandized* confession—the fact that Zappulla's first trial ended in a hung jury. *See supra* at [471]. While this fact is properly considered, it is by no means determinative. As this court recently observed, "[a] jury may hang for any number of reasons, including the idiosyncratic views of a single juror." *United States v. Newton,* 369 F.3d at 680. In Zappulla's case the record reveals that the first jury hung with eleven members in favor of conviction and one juror favoring acquittal. *See* Trial Tr. at 685, 697.

The majority also suggests that the "length and deliberative conduct" of the jury at Zappulla's second trial indicates that the evidence of guilt was not overwhelming. *Supra* at [471]. I cannot agree. The jury, which was charged on the law on the morning of March 10, 1999, returned a guilty verdict at 5:15 p.m. the same day. During that time, it made several requests for evidence. Given that the charge in the case, murder, could not have been more serious, neither the jury's interest in carefully reviewing the evidence nor the length of its deliberations can reasonably be interpreted as indicative of a weak case. When in *United States v. Jean–Baptiste,* 166 F.3d 102 (2d Cir.1999), we noted that a full day's deliberations indicated that the government's case was not overwhelming, we were dealing with a charge of making a false statement on a passport application, *see* 18 U.S.C. § 1542, and the "entire presentation of evidence at trial consumed little more than half a day," *Jean–Baptiste,* 166 F.3d at 109. Given that Zappulla's trial spanned a week during

Where, as in this case, an informant (even one with a record and a deal), recounts an admission by the defendant that is remarkably detailed and largely corroborated, it is not "objectively unreasonable" for a state court to conclude that such evidence, together with proof that the defendant was with the murder victim at and about the time of her death and that the victim's blood was on the defendant, so overwhelmingly establishes guilt that "there [was] no reasonable possibility that the error of admitting defendant's [un-*Mirandized* confession] into evidence might have contributed to his conviction." *People v. Zappulla*, 282 A.D.2d at 698, 724 N.Y.S.2d at 435.

2. *The Prosecution's Reliance on the Signed Confession Does Not Render "Objectively Unreasonable" the State Court Determination of Harmless Error*

As the majority notes, in the prosecution's opening statement at Zappulla's second trial, it identified the signed confession as the first piece of evidence and discussed in more detail the interaction between Zappulla and the police that led to this statement. On the other hand, no greater emphasis was placed on the confession during the evidentiary phase of the second trial, and the prosecution did not even refer to the confession in summation until twenty-five pages into the argument. The summation discussion of the confession takes up a scant few of the more than forty-five total pages, with at least equal time devoted to a discussion of Zappulla's admissions to Pabon.

This conduct does not compare to that in *Campaneria v. Reid*, where the prosecutor's summation emphasized an inadmissible confession almost to the exclusion of the properly received evidence. 891 F.2d at 1023–24 (Kearse, J., dissenting) (noting that in a fourteen-page summation, the prosecutor directed the jury's attention to the inadmissible confession no less than a dozen times). At issue in *Companeria* was a tape-recorded interrogation conducted after defendant had invoked his right to remain silent. Despite the summation concerns raised by Judge Kearse, the majority concluded that receipt of the inadmissible evidence was harmless in light of a trio of untainted admissions by defendant. *Id.* at 1022. Given the overwhelming admissible evidence of Zappulla's guilt already discussed, I cannot conclude that the prosecutor's use of the un-*Mirandized* confession at the second trial was so prejudicial as to render the Appellate Division's finding of harmlessness "objectively unreasonable."

3. *The Signed Confession Was Cumulative of the Admission to Pabon and Did Not Prejudice Zappulla's Defense that Cohen Was the Real Murderer*

The majority concludes that the confession in this case cannot be deemed cumulative because it "filled in a missing link to the prosecution's case: motive." *Supra* at [472]. I respectfully disagree. Zappulla's admission to Pabon put before the jury the same motive for Scarpati's death as did the confession: a dispute with Scarpati over missing jewelry. To this extent the statement was cumulative.[15]

---

which twenty witnesses testified, some persons might conclude that a verdict returned in a day's time was more indicative of a strong rather than a weak prosecution case.

**15.** To support its conclusion that the confession was not cumulative evidence, the majori-

ty quotes the prosecutor's statement in colloquy: " 'how do we show any motive of why the killing happened, other than by the defen-

The majority states that receipt of the confession into evidence prejudiced the defense by resolving in Pabon's favor an inconsistency between Zappulla's admission that he killed Scarpati in a dispute about missing jewelry and Aaron Cohen's testimony that Zappulla had voluntarily given him jewelry to sell for drugs. The conflict was important to the defense argument that "Cohen was actually the murderer." *Supra* at [473]. Once again, I must disagree.

First, I am not persuaded that the identified conflict exists within the *admissible* evidence, i.e., between Zappulla's admission as reported by Pabon and Cohen's testimony. According to Pabon, Zappulla was angry with Scarpati, not Cohen, about the missing jewelry. Thus, a jury could reasonably have believed both Pabon and Cohen, concluding that Zappulla had voluntarily given Cohen some jewelry to sell for drugs, but had then become angry with Scarpati when he discovered other jewelry missing.[16]

Second, it is Zappulla's un-*Mirandized* confession, not his admission to Pabon, that establishes the conflict identified by the majority. Zappulla told the police that he had argued with Cohen as well as Scarpati about missing jewelry, implying either that he had never given any jewelry to Cohen (contrary to Cohen's testimony) or, if he did, that he never intended the jewelry to be sold.[17] The problem for Zappulla is that, in the same confession, he admitted killing Scarpati, thereby rendering any

conflict about the sale of the jewelry irrelevant to identification of the murderer. A defendant can hardly claim prejudice from the fact that the same piece of evidence that affords him a possible line of impeachment renders the subject of impeachment irrelevant to the critical issue in the case.

I confess to a certain puzzlement as to how resolution of the jewelry conflict would, in any event, support a defense that Cohen, not Zappulla, was Scarpati's murderer. If the jury decided that Cohen was lying about receiving jewelry voluntarily from Zappulla, that would leave intact Zappulla's motive for killing Scarpati. If, on the other hand, the jury decided Cohen was telling the truth, it is hard to see how veracity would make it more likely that he was a murderer. At best, such a finding might raise questions about Zappulla's credibility in telling the police that he argued with Cohen about jewelry, or about the credibility of the police in reporting Zappulla's confession. But since Pabon did not testify to any statements by Zappulla regarding a jewelry dispute with Cohen, Cohen's testimony would not impeach him.

In considering how, if at all, the un-*Mirandized* confession prejudiced Zappulla's purported defense that Cohen killed Scarpati, it is worth noting that this possibility was raised only obliquely in defense counsel's summation at Zappulla's second trial. In cross-examining Cohen, defense counsel never directly confronted the cab

---

dant's own statement.' " *Supra* at [472] (quoting Trial Tr. at 167). The statements under discussion, however, were neither Zappulla's confession to the police nor his admission to Pabon. Rather, the parties were arguing about whether Cohen should be allowed to testify to Zappulla's statements to him in a March 16 conversation about jewelry. The defense objected to this evidence on hearsay grounds. *See* Trial Tr. at 164–68.

**16.** The fact that Zappulla still had jewelry in his pocket at the time of arrest indicates that he did not give Cohen all the jewelry.

**17.** The latter possibility is suggested by Zappulla's confession that "he got mad because Aaron and Jennifer had taken advantage of him while he was high," and that "[h]e never gave them permission to sell [his girlfriend's] jewelry." Trial Tr. at 497.

488

driver with the possibility that he was Scarpati's murderer. Indeed, the cross-examination, conducted on a first-name basis, was almost cordial, *see* Trial Tr. at 181 ("Q: Good afternoon, Aaron. A: Good afternoon, Sam."), a result, perhaps, of Cohen's willingness to speak with the defense as well as the prosecution in advance of trial. Significantly, counsel carefully avoided probing Cohen's whereabouts during the hours when the murder likely took place, although Cohen testified that law enforcement authorities had required him to provide such information. Instead, relying on the fact that Cohen did not attempt to contact Scarpati any time after 5:30 p.m. on March 16, counsel made a single attempt to insinuate that Cohen might be the real murderer without ever actually saying so: "Does it make sense to anyone of you here that this person with all that contact, all of a sudden stopped at 5:30 after hearing his friend, who he is worried about, had a fight at 5:30? Didn't look for her, didn't find her, didn't go to the police; they came to him a week later." Trial Tr. at 692.

The majority nevertheless concludes that such a defense "was not far-fetched" because Cohen abused crack, had access to Room 234, and had argued with Scarpati on the afternoon of her death. *Supra* at [473]. These points, raised by Zappulla's counsel on appeal, were not in fact ever argued to the jury as a basis for thinking Cohen was the real murderer. In any event, it was Cohen who disclosed the fact that *Scarpati* was angry with *him*—not necessarily the other way around—for wanting to bring another prostitute to Room 234 early in the morning on March 16. Presumably, the majority thinks this dispute provides a motive for murder. Indeed, the majority concludes that precisely because Cohen and Scarpati were "very, very close friends" that it was "more likely" he would "kill her than a random stranger, like Zappulla." *Supra* at [473]. The majority's assumption that Zappulla and Scarpati were "random stranger[s]" is belied by the evidence. Bruce Brodsky, with whom Scarpati lived, testified that Zappulla and the murdered woman were neighborhood friends. *See* Trial Tr. at 471. Indeed, at the pre-trial suppression hearing, it was revealed that Zappulla's girlfriend, in making her March 15 complaint to the police, had stated that Zappulla might be found in the company of "Jennifer Imparato," another name used by Scarpati. *See* Hearing Tr. at 36, 79. Even if the couple had been strangers before March 15, it is not obvious to me why a prostitute's murderer was "more likely" to have been a "very, very close friend" than the "random stranger" with whom she was sharing the room in which she died, particularly when that "stranger" is found to have the woman's blood at ten different locations on his clothing and provides a detailed admission of guilt to a fellow inmate.

In sum, like the justices of the Appellate Division and Judge Weinstein, I am convinced that the admissible evidence of guilt—Zappulla's presence in Room 234 with Scarpati at and about the time of her murder; the dead woman's blood on his clothing on the day of her death; and Zappulla's detailed admission of guilt to Felix Pabon, corroborated in almost every respect by other admissible evidence—is overwhelming. Further, I am satisfied that Zappulla's un-*Mirandized* confession of guilt was cumulative of the more-detailed admission to Pabon on the issue of motive, did not prejudice his defense, and was not unduly highlighted by the prosecution to the exclusion of the admissible evidence. Accordingly, I conclude that the Appellate Division's finding of harmless error in this case was not "objectively un-

reasonable" and I would affirm the denial of habeas corpus relief on that ground.

### 4. Ambiguities in the Record Relating to Whether There Was a Miranda Error in this Case

Because I am convinced that the Appellate Division finding of harmless error was objectively reasonable, I would not reach respondent's argument that there was, in fact, no *Miranda* error in this case. Because my colleagues in the majority do address this point and summarily conclude that the totality of the circumstances support a finding of error, *see supra* at [474–75],[18] I briefly explain why I do not find this question so easy to answer on the record before us.[19]

Preliminarily, it is important to recall that the issue presented by Zappulla's confession is not one of Fifth Amendment compulsion but one of due process. Specifically, after the police gave Zappulla *Miranda* warnings when he was first arrest-

ed in connection with theft allegations by his girlfriend, did due process demand that those warnings be re-administered approximately twenty-four hours later before police questioned Zappulla about Jennifer Scarpati's murder?

If, as the majority states, upon first being advised of his rights, Zappulla "refused to speak" with the police about the crime then under investigation, the theft from his girlfriend, *supra* at [474], then I would agree that the law permits interrogation about a different crime only upon re-advice of rights. *See Campaneria v. Reid*, 891 F.2d at 1021 (noting that even after a defendant has asserted his right to remain silent, "[q]uestioning can be resumed after fresh *Miranda* warnings are given and the right to remain silent is otherwise scrupulously honored, for example, by renewing the questioning only after the passage of a significant period of time and by limiting the renewed questioning to a different subject matter than the original

18. The only "circumstances" referenced in the majority opinion are three identified by the Appellate Division: (1) approximately twenty four hours had passed between Zappulla's initial receipt of *Miranda* warnings and police questioning about the Scarpati murder, (2) Zappulla was not in continuous police custody in this interval, and (3) the later interrogation concerned a different crime from the one for which Zappulla was initially arrested. *See People v. Zappulla*, 282 A.D.2d at 697–98, 724 N.Y.S.2d at 435–36.

19. Federal courts considering petitions for writs of habeas corpus are not "bound by a state appellate court's ruling in petitioner's favor on a matter of constitutional law." *Pinkney v. Keane*, 920 F.2d 1090, 1093 (2d Cir.1990) (affirming district court denial of habeas on the basis of evidence ordered suppressed by the state appellate court), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991). Although AEDPA requires deference to state court rulings challenged by a petitioner seeking habeas relief, the statute nowhere requires parallel defer-

ence to rulings in his favor. Nor is such symmetry warranted. The observations made by Judge Oakes, writing for the panel in *Pinkney*, are as pertinent after AEDPA as they were before:

> [W]e believe that symmetry, while aesthetically pleasing, is a particularly inappropriate principle to invoke in a habeas proceeding under 28 U.S.C. § 2254. Habeas corpus is not a neutral proceeding in which the petitioner and the State stand on an equal footing. Rather, it is an asymmetrical enterprise in which a prisoner seeks to overturn a presumptively valid judgment of conviction. Because of this, the petitioner generally bears the burden of proof throughout the habeas proceeding.... In addition, issuance of the writ is an extraordinary remedy, ... granted only in the exercise of a sound judicial discretion.... To constrain the State merely to impose some symmetry on an otherwise one-sided proceeding would be to substitute aesthetics for legal reasoning.

*Pinkney v. Keane*, 920 F.2d at 1094 (internal citations omitted).

interrogation") (citing *Michigan v. Mosley,* 423 U.S. 96, 104–07, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). But the record is somewhat ambiguous as to whether Zappulla actually refused to answer any questions about the theft or simply responded to all police inquiries by diverting the conversation to other matters.

Further, to the extent interrupted custody and the passage of time are relevant factors in determining when *Miranda* warnings must be re-administered, the unusual circumstances in this case must be noted. Zappulla's police custody was interrupted only because he attempted to escape and, in the process, was hit by a car, requiring a hospital visit that delayed the second interrogation. For purposes of considering the police obligation to re-administer *Miranda* warnings, Zappulla's situation is hardly analogous to that of a person released from custody with freedom to go where he wished for twenty-four hours, or to a person whose own conduct played no role in delaying his interrogation.

Even assuming, however, that police were required to re-advise Zappulla of his *Miranda* rights, the law would demand suppression only of custodial statements made in response to interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The record suggests that after being told that the police had found Scarpati's body and wished to question him on the matter, Zappulla promptly stated that he wanted a lawyer. *See* Trial Tr. at 274, 486. However, when the police responded that "if he wanted an attorney [they] would provide one to him, but that [they] weren't going to speak to him any longer," Zappulla clarified that "no, you don't understand. I

don't want an attorney for me.. I want a[n] Assistant District Attorney here so that we can get some stuff down in writing." *Id.* at 488; *see also id.* at 274 ("[N]o, not a lawyer for me, I want the D.A. down here.").[20] Zappulla explained that he wanted the district attorney present "to get this over with" so that he could be "guaranteed the death penalty." *Id.* at 275; *see also id.* at 486. ("I feel that I want to have a lawyer here so that we can all sit down together and get this thing straight, because I want the death penalty."). Apparently, no issue was raised in the state courts and, therefore, no findings were ever made, as to whether Zappulla's statements regarding an attorney and, more importantly, the clarification that followed, were responses to interrogation. I note this point because if these statements were admissible, particularly Zappulla's professed desire for the death penalty, it would certainly reinforce the Appellate Division's conclusion that receipt of the written confession was harmless error.

While I do not urge remand to clarify these ambiguities because I would affirm the Appellate Division's ruling on harmless error, because the majority is not of that view and, nevertheless, addresses none of these concerns, I cannot join its holding that *Miranda* necessarily mandated the suppression of all Zappulla's statements regarding the Scarpati murder.

The majority observes that it is not "too much" in a free society to require the state to retry a defendant who has been deprived of due process in a way that is not harmless. *See supra* at [475]. I agree. But the cost of such a retrial should not be underestimated; it is borne not only by the state, but by victims, witnesses, the

---

**20.** This exchange suggests that the issue before us is technical *Miranda* compliance; there appears to be no question that Zappulla was, in fact, fully aware of his rights in speaking with the police.

judicial system, and society itself. Nor should blithe assumptions be made that if I (and six other reviewing judges) am right that the admissible evidence of Zappulla's guilt was overwhelming, "the State should not find it difficult to properly obtain a conviction" for murder. *Supra* at [475]. The passage of time can complicate retrial of even the strongest cases: witnesses die or become difficult to locate; memories fade; evidence degrades. For all these reasons, habeas relief is warranted only if a petitioner demonstrates that his conviction was, in fact, infected by constitutional error and that error was not harmless.

This is not such a case. The Appellate Division expressly found that any *Miranda* error was harmless beyond a reasonable doubt, and the overwhelming admissible evidence of guilt simply does not permit me to label this ruling objectively unreasonable. Accordingly, I respectfully dissent from the court's grant of a writ of habeas corpus on this appeal.